**John Sayeed FARUKI, Plaintiff**

v.

**William P. ROGERS et al., Defendants.**

**Civ. A. No. 175–72.**

United States District Court,
District of Columbia.

Oct. 6, 1972.

Joseph Onek and Richard A. Frank, Washington, D. C., for plaintiff.

David J. Anderson, John M. Kelson and Stuart Schiffer, Attys., Dept. of Justice, for defendants.

Before WRIGHT, Circuit Judge, and HART and FLANNERY, District Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case involves the constitutionality of Section 515 of the Foreign Service Act of 1946, 22 U.S.C. § 910 (1970). The statute provides:

"No person shall be eligible for appointment as a Foreign Service officer unless he is a citizen of the United States and has been such for at least ten years."

In our view, this eligibility requirement violates the equal protection guarantee applicable to the federal government through the due process clause of the Fifth Amendment.[1] The statute clearly discriminates in favor of persons receiving their citizenship at birth and against those who came to America as aliens and were naturalized. As such, it must bear close judicial scrutiny to determine whether it is necessary to further a compelling governmental interest. We find that it is not. Moreover, when viewed in light of the statutory scheme of which it is only a part,[2] I would find that Section 515 fails even the less demanding "rational basis" test. Thus we are compelled to enjoin its enforcement and to order the defendants to administer the Foreign Service entrance examinations to plaintiff Faruki.

I

The facts and procedural posture of this case, about which there is no dispute, can be quickly summarized. John Sayeed Faruki was born in India in 1935 and became a citizen of Pakistan in 1954. He took his undergraduate degree in economics, political science and English literature at Sind University in Pakistan in 1955. Two years later Sind University granted him a master's degree in English literature. He emigrated to this country in 1959 and became a naturalized citizen in 1966. While he was still an alien, in 1964, the State Department hired him as an instructor in the School of Language Studies, Department of Near East and African Languages, at the Foreign Service Institute which, incidentally, provides courses for the officer corps presently closed to Faruki.[3] In December 1967 Faruki left the Foreign Service Institute. He is currently employed as a transportation specialist in Washington, D. C.

On October 20, 1971, Faruki applied to the State Department to take the written examination for the Foreign Service scheduled to be administered on December 4, 1971. He was informed that he could not take the examination because he did not meet the durational citizenship requirements adopted by the State Department pursuant to Section 515. 22 C.F.R. §§ 11.2(b), 501.6(b) (1972) provide that only citizens of at least seven and a half years duration may be administered the examinations. Faruki then brought an action for de-

---

1. *See* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Watson v. United States, 141 U.S.App.D.C. 335, 439 F.2d 442 (1970) (*en banc*).

2. *See* 22 U.S.C. §§ 900–915 (1970).

3. *See* 22 U.S.C. §§ 1041, 1044 (1970).

claratory and injunctive relief against enforcement of the statute and the regulations adopted thereunder. Since Faruki sought injunctive and not merely declaratory relief, District Judge Hart properly requested the convening of this three-judge court under 28 U.S.C. §§ 2282, 2284 (1970).[4]

## II

█ Since Section 515 is said to violate the equal protection guarantee, we must be clear at the outset as to the nature of the discrimination alleged.[5] Equal protection requires scrutiny of the standards by which persons are classified by law. The guarantee ensures that a minimal standard of equity and reasonableness constrains the process by which government regulation allocates burdens and benefits. *Compare* Powell v. Pennsylvania, 127 U.S. 678, 687, 8 S. Ct. 992, 32 L.Ed. 253 (1888), *with* McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

Both parties here agree that the obvious and inescapable effect of Section 515 is to make it more difficult for naturalized citizens born abroad like Faruki to join the Foreign Service than it is for native-born citizens. The discrimination occurs in the following way. Persons born in the United States are citizens at birth, as are persons born abroad to parents of American citizenship. 8 U.S.C. § 1401(a) (1970).[6] Since Department of State regulations provide that only citizens above the age of 21 or college graduates above the age of 20 are eligible for appointment as Foreign Service officers, 22 C.F.R. § 11.2(b) (1972), the 10-year statutory durational citizenship requirement is no barrier to them. With respect to naturalized citizens who achieve citizenship after they come to this country, the situation is obviously

different. In particular, those who become citizens after the age of 11, whether through their own initiative as in Faruki's case, through the naturalization of their parents,[7] through adoption,[8] or by marriage,[9] do not have the opportunity to join the Foreign Service at the same time as native-born citizens. They must wait until they meet the 10-year citizenship requirement.

Facing a period of delay, to be sure, is a milder burden than a total disqualification from eligibility. But it is hardly a trivial disadvantage. It means that many foreign-born citizens who wish to join the Foreign Service and have confidence in their abilities to pass the State Department's rigorous battery of examinations must mark time waiting for a career opportunity freely open to the native born. More than this, we must take notice of the probability that this delay, whether it is long or short, will have a deleterious effect on naturalized citizens' opportunity for advancement in the Service because of the weight that is inevitably given to seniority. *See* 22 U.S. C. §§ 902, 912, 923 (1970). This disadvantage appears particularly relevant in Faruki's own case. Currently 37 years old, he must wait until he is 41 to be eligible under the statute. Is there any question that his career opportunities, already cut short by his failure to become a citizen until he was 31, will probably suffer further?

Finally, we cannot escape noticing that the basis of the delay to which naturalized citizens are subject is, in many cases, largely adventitious. While some foreigners might be able to make a conscious, informed choice as to the date of their immigration to America and, thus, a rough prediction as to when they will become citizens and when they will be eligible for jobs with durational citizen-

---

4. *See* Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

5. *See* Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 173, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

6. *See generally* United States v. Wong Kim Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898).

7. *See* 8 U.S.C. § 1432 (1970).

8. *See* 8 U.S.C. § 1434 (1970).

9. *See* 8 U.S.C. § 1430 (1970).

ship requirements, others, especially children, have this choice made for them by parents who may know little if anything about employment barriers that stand in naturalized citizens' way and, in any event, are not likely to base their decisions on when to emigrate on the existence of such laws. Moreover, it seems at least questionable to us whether any immigrants do—or should—calculate that they will face employment barriers based wholly on their acquisition of citizenship later than native-born Americans.

## III

■■ Understanding the nature and effect of a statutory classification is, of course, only the beginning of the constitutional inquiry into the applicability of the equal protection guarantee. Guided by a proliferation of Supreme Court decisions in recent years, we must decide the appropriate standard of review for the challenged classification. In this case, we have little doubt that Section 515 must be "measured by a strict equal protection test." Dunn v. Blumstein, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). By this we mean that the Government has the burden of showing "a substantial and compelling reason" for imposing the durational citizenship requirement. Id. at 335, 92 S. Ct. 995, 31 L.Ed.2d 274. This test also requires that the statute must be drawn with precision to achieve its objectives. Id. at 342–343, 92 S.Ct. 995, 31 L.Ed.2d 274. On the one hand, the statute must not sweep too narrowly, affecting some, but not all, persons who logically should be covered by its purported rationale. See Shapiro v. Thompson, 394 U.S. 618, 635, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). One would think that if government's interest in a given statutory scheme were, in fact, seriously compelling, the regulation would not have obvious holes in its coverage. On the other hand, the statute must not sweep too broadly lest it burden persons who appear to stand beyond the scope of its rationale. See Dunn v. Blumstein, supra,

405 U.S. at 343, 92 S.Ct. 995, 31 L.Ed.2d 274; McLaughlin v. Florida, supra, 379 U.S. at 197, 85 S.Ct. 283, 13 L.Ed.2d 222 (Mr. Justice Harlan, concurring); cf. United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Where a statute imposes a clear disability, as here, the defect of over-inclusion may be worse than that of under-inclusion, since it would seem more objectionable to impose burdens where they do not belong than to grant what amount to exemptions. See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1086–1087 (1969).

■ It should be apparent, then that the "compelling interest" standard of review is exceedingly exacting. It is quite openly unsympathetic to the ordinary practicalities of the legislative process. True precision in statutory coverage is hampered by a variety of factors with which legislators must invariably contend. These include the frequent necessity for compromise with interests potentially affected by government regulation as well as inability of government to amass the resources necessary to extend a given scheme of regulation to its full logical sweep. Moreover, government standards frequently embody a set of overlapping and sometimes conflicting rationales and judges have historically been wary of analyzing them and sorting them out to decide whether they are optimally satisfied by a challenged law. These considerations, coupled with the traditional deference shown by the judiciary toward the policy judgment of the political branches, militate against use of the "compelling interest" as a matter of course. Thus the customary standard of review for legislation challenged as offensive to the equal protection guarantee is far less rigorous. Ordinarily, legislative distinctions are analyzed to see whether they bear a "rational relationship to a state objective that is sought to be advanced" by the statute in question. Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). "If the classification has some 'reasonable basis,' it does not offend the

Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *quoting* Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). In the broad run of cases, equal protection is a guarantee against arbitrariness, against discrimination that rests "on grounds wholly irrelevant to achievement of the regulation's objectives." Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 (1947).

In cases involving fundamental rights, however, the compelling interest test has a most important role in equal protection adjudication, one that we believe is pertinent here. Within a few years of the ratification of the Fourteenth Amendment, which introduced the equal protection guarantee, the Supreme Court made clear that its overriding purpose was to invalidate laws which discriminated against blacks. The Slaughter-house Cases, 83 U.S. (16 Wall.) 36, 81, 21 L.Ed. 394 (1873). The guarantee's apparent purpose to forbid discrimination against persons on the basis of features over which they could be safely assumed to have no control, like race, was soon viewed by the Court as applicable to laws which imposed burdens on persons according to their national origins. *See* Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 308, 25 L.Ed. 664 (1880). It

has become clear that application of the compelling interest test to statutes drawn on lines of race or nationality is the means by which the judiciary ensures that such laws represent more than an official expression of naked prejudice. *See* Loving v. Virginia, 388 U.S. 1, 9–12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

As the equal protection guarantee has been utilized increasingly to prevent official classifications which raise the possibility of prejudice, the category of suspect classifications has been broadened. After World War II, which brought home the sickening length to which irrational prejudice on the basis of purely adventitious features could be taken, the Supreme Court suggested that aliens resident in the United States warranted the same special solicitude under the equal protection clause that had been traditionally given to blacks and members of specific nationality groups. *See* Takahashi v. Fish and Game Commission, 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). And just last year Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), made clear that the approval the Supreme Court had once given to state laws restricting aliens' power to own land,[10] exploit natural resources,[11] and obtain public employment[12] was based on obsolete premises. *Id.* at 373–374, 91 S.Ct. 1848, 29 L.Ed.2d 534. *Graham* specifically ruled that classifications based on alienage are "inherently suspect and

10. *See* Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); Porterfield v. Webb, 263 U.S. 225, 44 S.Ct. 21, 68 L.Ed. 278 (1923); Webb v. O'Brien, 263 U.S. 313, 44 S.Ct. 112, 68 L.Ed. 318 (1923); Frick v. Webb, 263 U.S. 326, 44 S.Ct. 115, 68 L.Ed. 323 (1923).

11. *See* Patsone v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539 (1914); McCready v. Virginia, 94 U.S. (4 Otto) 391, 24 L.Ed. 248 (1877).

12. *See* Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915). *Com-*

*pare* Chapman v. Gerard, 3 Cir., 456 F.2d 577 (1972) (right of alien residents to participate in Virgin Islands Territorial Scholarship Fund); Dougall v. Sugarman, S.D.N.Y., 339 F.Supp. 906 (1971) (3-judge court), *prob. juris. noted,* 407 U.S. 908, 92 S.Ct. 2434, 32 L.Ed.2d 682 (1972) (right to apply for competitive class of civil service). *But see* In re Griffiths, 162 Conn. 249, 294 A.2d 281, *prob. juris noted,* 406 U.S. 966, 92 S.Ct. 2413, 32 L.Ed.2d 665 (1972) (right of aliens to gain admission to bar).

subject to close judicial scrutiny." *Id.* at 372, 91 S.Ct. at 1852.

While it is formally correct to say that Section 515 does not distinguish between aliens and citizens, it is also true that it classifies citizens on the basis of alienage. Citizens who were once aliens, like Faruki, are subject to an unmistakable barrier to entry into the Foreign Service that native-born citizens who were not aliens do not have to surmount. Moreover, it seems to us that the case for "heightened judicial solicitude," Graham v. Richardson, *supra,* 403 U.S. at 372, 91 S.Ct. 1848, 29 L.Ed.2d 534, is even stronger in a case like this, where the statute differentiates between native-born citizens and those who were once aliens,[13] than where a distinction is drawn between aliens and citizens. There is little doubt that the Government retains at least some power, particularly in administering a system of naturalization, to impose burdens on aliens that obviously have no relevance to citizens.[14] And there seems little dispute that the states have power to restrict the franchise to citizens. *Cf.* U.S. Const., Amend. 15. It may be that distinctions in these contexts would meet the compelling interest standard, but this is not the point. Rather, it is that grounds for such distinctions are quite plausible and do not raise the spectre of unfair prejudice.

The case is radically different, we think, where the Government grants citizenship to an immigrant and then, solely on the basis of his original foreign status, proceeds to give him second-class, more burdensome treatment. Classifications of this sort have the defect of denying the promise of equal opportunity which this country has traditionally and proudly held open to the millions of immigrants who have literally built America in the hope that they could share fairly in its benefits. Worse, in our mind, such classifications, like those based on race, have about them an odor of prejudice against and oppression of poorly represented minority groups. *Cf.* United States v. Carolene Products Co., 304 U.S. 144, 152–153 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); United States v. Thompson, D.C. Cir., 452 F.2d 1333, 1338–1339 (1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972). Our history, in fact, is dotted with shameful incidents in which the foreign-born—citizen and non-citizen alike—have been subjected to hysterical popular oppression. It should be enough to cite the existence of the Know-Nothing or American Party in the 1850's and the Red Scare and the renascence of the Ku Klux Klan after World War I as examples of nativist oppression that loom in our background. *See* J. Higham, Strangers in the Land (2d ed. 1963). *Compare* Korematsu v. United States, *supra,* and Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

Moreover, the Supreme Court has indicated its own concern to protect naturalized Americans from differential treatment in cases dating back to the early 19th century. *See* Knauer v. United States, 328 U.S. 654, 658, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946); Luria v. United States, 231 U.S. 9, 22, 34 S.Ct. 10, 58 L.Ed. 101 (1913); Osborn v. Bank of United States, 22 U.S. (9 Wheat.) 738, 827, 6 L.Ed. 204 (1824). And in Schneider v. Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964), the Court indicated that statutes imposing greater burdens on the naturalized than on the native-born would not be upheld on a mere rational basis test.

---

13. Although the statute does not distinguish between native-born and naturalized citizens in terms, its inescapable effect is to impose different burdens upon the two groups. We are as justified in imposing strict scrutiny in this case as where the language of the statute makes the classification overt. *See* Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

14. *See, e. g.,* Harisiades v. Shaughnessy, 342 U.S. 580, 586–588, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

There the Court invalidated a statute stripping a naturalized citizen of her citizenship where she had resumed residence for three years in the country of her origin. Although the Government argued that the foreign relations power justified the law as a means of avoiding embarrassing entanglements with foreign governments which might attempt to impose obligations on such citizens, the Court found this rationale insufficient in view of the burden imposed on naturalized citizens that did not apply to native-born Americans who wished to live abroad.

Our conclusion that classifications between native-born and foreign-born citizens warrant strict scrutiny is not disturbed by the Constitution's inclusion of durational citizenship requirements for senators and representatives. U.S. Const., Art. 1, §§ 3, 2. First we note that there are no such provisions for Foreign Service officers. Moreover, we read these constitutional provisions as limited exceptions staked out by statesmen obviously and not unreasonably wary of undue influence by foreign powers in the development of a new nation. *See* J. Cooke (ed), The Federalist No. 62, pp. 415–416 (1961). It should go without saying that conditions have greatly changed in the intervening 185 years. Nor does the Government argue that Section 515 should be considered as a loyalty security device. Thus while we are precluded from second-guessing the reasons which prompted the Framers to include narrow and specific qualifications for federal legislative office, we are hardly compelled to extend their possibly obsolete reasoning to a different context.[15]

## IV

In areas where the compelling interest test applies, it is not enough merely to argue that the Government's interest in having highly competent Foreign Service officers is strong and that, *ipso facto*, any stringent qualification is valid. We do not deny the importance of the duties assumed by the Foreign Service. The conduct of diplomatic negotiations, the everyday contact between our State Department officers and foreign nationals, the reports Foreign Service officers in the field submit to Washington, and the planning activities they carry out all have a vital impact on maintenance of our national security. These tasks obviously require officials with considerable judgment, intelligence and courage.[16] Moreover, as the Government argues and the legislative history of Section 515 indicates,[17] the work of Foreign Service officers requires an intimate knowledge of American culture and domestic affairs. This knowledge is necessary not only for purposes of communicating effectively with foreigners. It is also important in the framing of intelligent foreign policies that will compel respect and support at home as well as abroad. But the question before us is not merely the gravity of the Government's interest in skilled diplomats, but the propriety and reasonableness of a classification allegedly aimed at furthering that interest.

In our view, Section 515 is an unduly rough and imprecise instrument for ensuring that citizens lacking sufficient knowledge of American culture, history and currents of thought are kept from the Foreign Service. For one thing, the

15. This same logic applies to the constitutional requirement that the President must be a "natural born Citizen," 35 years old, and "fourteen Years a Resident within the United States." U.S. Const., Art. 2, § 1.

16. *See* 92 Cong.Rec. (Part 8) 9588 (1946) (statement of Congressman Vorys, member of the House Foreign Affairs Sub-

committee which drafted the Foreign Service Act, of which § 515 is a part).

17. H.R.Rep.No.2508, 79th Cong., 2d Sess., 61 (1946). *See also* Hearings on Administration of the Department of State, Subcommittee on State Department Organization and Public Affairs, Senate Foreign Relations Committee, 86th Cong., 1st Sess., 220 (1959) (State Department statement supporting retention of § 515).

statute has a patently overbroad sweep. *See* McLaughlin v. Florida, *supra,* 379 U.S. at 193, 85 S.Ct. 283, 13 L.Ed.2d 222. We are given no reasons to believe that every naturalized applicant who has been a citizen for less than 10 years—or even the vast majority—is so unfamiliar with this country that he should be subject to a blanket disqualification. We cannot ignore the possibility that at least some immigrants to the United States will have had considerable contact with the American way of life before they reach our shores—by learning English in the numerous countries in Europe, Africa and Asia where it is taught to the young, by reading American periodicals that are available in United States Information Agency libraries throughout the world, by listening to United States Information Agency broadcasts, by attending schools where American history is offered in a course of study, and by getting to know American citizens, whether tourists, Foreign Service officers or Peace Corpsmen. Apart from these opportunities to learn about American life prior to arriving in the United States, it is surely possible, indeed probable, that some naturalized citizens are quick learners. At least some immigrants are likely to have such enthusiasm and intelligence that they will pick up the academic and more subtle idiomatic knowledge of American culture with greater speed than the legislation contemplates.

The crudeness of Section 515 as a device to ensure familiarity with our way of life is also illustrated by the differential treatment the statute affords immigrant aliens who may have lived here a considerable length of time before becoming citizens and citizens born of American parents in foreign countries who may never set foot in this country until they come to apply for appointment as a Foreign Service officer. The grant of citizenship to children under age 16 of aliens is dependent on the parents' willingness and eligibility for naturalization. 8 U.S.C. § 1432 (1970). In some cases alien parents, while sending their children to American schools and exposing them fully to our culture, may delay their own and therefore their children's citizenship well beyond the five years minimum requirement. It is certainly conceivable that a child may be brought to America as an infant and not receive citizenship until he is at least 15. Surely he has received sufficient exposure to our way of life, yet he is ineligible for the Foreign Service until he is 25 despite his length of residence. By contrast, foreign-born American citizens at birth who have never set foot in America face no similar barrier when they decide to come here, perhaps for the first time, to take the Foreign Service entrance examinations.

What makes us even more skeptical of the statute, however, is the existence of what seems to be a less invidious means of accomplishing the same ends, namely, the stringent battery of competitive written and oral examinations which applicants must pass before acceptance into the Foreign Service. 22 U.S.C. §§ 911, 912 (1970). The State Department's own bulletin on these examinations notes that they aim to test, on an individual basis, the same qualities that are said to underlie the durational citizenship requirement:

> " \* \* \* [T]he written and oral examinations are difficult and a broad general knowledge is needed in order to pass them. Candidates should have a sound knowledge of foreign and domestic affairs, current events and American history, government and culture. \* \* \* "

Memorandum, Board of Examiners for the Foreign Service, BEX–3, March 1971, p. 2. We are given no reason to believe this highly competitive, layered system of examination would not as efficiently screen out unqualified naturalized citizens as it apparently does native-born citizens. *Compare* Dunn v. Blumstein, *supra,* 405 U.S. at 345–353, 92 S.Ct. 995, 31 L.Ed.2d 274.

Although the existence of any blanket disqualification seems unduly stringent, we are also concerned over the require-

ment's restricted scope. Assuming *arguendo* that an applicant for the Foreign Service can gain sufficient knowledge of American life only through a durational requirement, we have difficulty understanding why such a rule in the form of a residency requirement, for example, does not apply to those American citizens, native-born and born abroad of American parents, who spend their childhoods and adolescent years abroad. Of course, it might be argued that citizens of birth are likely, through their parents, to acquire an intimate knowledge of American culture through their home life. But this is not necessarily the case, particularly where their parents are expatriates who have informally rejected the American way of life or missionaries working closely with foreigners. In any event, the question is simply one of probability, and we are given no indication that native-born citizens who have spent their youths abroad and return as adults and immediately are eligible for the Foreign Service have any greater understanding of American culture than naturalized citizens who have ordinarily spent at least five years here as aliens. In the absence of any argument to the contrary, the question as to the comparative qualifications of naturalized citizens living in America and native-born citizens who have spent their early years abroad seems an open one. Thus we have reason to believe the statute may be fatally underinclusive as well.

We are unpersuaded by the Government's contention that Section 515, notwithstanding the distinction it draws between the naturalized and the native-born, should be granted special deference because it relates to the conduct of foreign affairs. Where constitutionally protected rights are at stake—here the interest in freedom from invidious discrimination on the basis of place of birth and parentage—notions of automatic deference disappear. The need for careful judicial scrutiny of assertions of diplomatic exigency was made clear in Schneider v. Rusk, *supra,* which

dealt with a classification very similar to this one. And we believe the weakness of the automatic deference argument in the foreign relations area was made emphatically clear just a year ago in New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

All in all, the statute's imprecise sweep, coupled with the unproven assumptions that apparently underlie the barrier it imposes to naturalized citizens, leads us to conclude that Section 515 cannot withstand strict scrutiny. It is therefore our duty to declare it invalid and enjoin its future application.

V

We have outlined the considerations —history, precedent and fear of invidious prejudice—that require us to subject Section 515 to the compelling interest standard of review. The Government's main rejoinder is that strict scrutiny should be saved for statutory or administrative classifications that affect "fundamental interests" like access to the vote, *see, e. g.,* Dunn v. Blumstein, *supra,* or the right to travel between states, *see e. g.,* Shapiro v. Thompson, *supra.* Since only an elite federal position is at stake here, it is said, the compelling interest standard has no place. The answer to this is simple. Graham v. Richardson, *supra,* subjected a statute discriminating along lines of alienage to strict scrutiny notwithstanding the fact that the interest at stake was in welfare benefits, an interest that the Supreme Court had specifically rejected as "fundamental." Dandridge v. Williams, *supra,* 397 U.S. at 485, 90 S.Ct. 1153, 25 L.Ed.2d 491. Indeed, *Dandridge* said that the inquiry into fundamental interests—the importance of the benefit or burden at issue in a given classification —is to be conducted quite separately from the inquiry into whether the classification is drawn along "inherently suspect" lines. *Ibid.* & n.17.

Nor need we give much weight to the Government's reliance on Rogers v. Bellei, 401 U.S. 815, 91 S.Ct. 1060, 28 L.

Ed.2d 499 (1971), where the Supreme Court applied the rational basis test in upholding Section 301(b) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1401(b) (1970), which provided that persons born abroad to an American citizen and to an alien could not retain the citizenship they received at birth unless they spent at least five successive years in the United States between the ages of 14 and 28. Although the statute in *Bellei* clearly imposed a greater burden on one type of citizenship on the basis of parentage and place of birth than on others, we do not think the Court's reasoning or holding is apposite here.

First of all, the statute in *Bellei* dealt with the narrow category of citizens outside the protection of the Fourteenth Amendment, 401 U.S. at 827–831, 91 S. Ct. 1060, 28 L.Ed.2d 499, and thus not subject to the rule of Afroyim v. Rusk, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), that citizens born in the United States or naturalized *in* the United States could not be divested of their citizenship except by their own assent. *Id.* at 257, 87 S.Ct. 1660, 18 L.Ed.2d 757. This distinction obviously has no place here, since Faruki was naturalized in the United States and thus is entitled to full Fourteenth Amendment protection. Second, and more important, the statute challenged in *Bellei* was part and parcel of the immigration and naturalization process, the substantive and procedural rules by which the Government regulates the entry and expulsion of aliens and admission to citizenship. Mr. Justice Blackmun, the author of *Bellei,* indicated clearly that this power was at issue when he argued that the condition subsequent attached to citizenship by the statute was little different, functionally, from withholding citizenship altogether until the residency requirement was met. 401 U.S. at 834–835; *see also id.* at 831, 91 S.Ct. 1060, 28 L.Ed.2d 499. Traditionally, the Government has been accorded considerable leeway in its choice of rules governing the entry and expulsion of aliens and the naturalization process. *See* Harisiades v. Shaughnessy, 342 U.S. 580, 586–588, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Fong Yue Ting v. United States, 149 U.S. 698, 724–728, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); The Chinese Exclusion Case, 130 U.S. 581, 606, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). But Section 515, it should be clear, has not even a remote connection with either the naturalization process or the Government's power to permit aliens on American soil. Rather, the durational citizenship requirement relates to a wholly different function—the power to recruit persons who have passed through the naturalization process and are indisputably citizens to assist the Executive in the conduct of foreign policy. Thus it is simply wrong to argue that *Bellei* compels a rational basis standard of review here or otherwise controls the outcome of the case.

## VI

But even if we assume the Government is correct in arguing for a milder standard of review, I believe the statute is still defective. I believe Section 515 fails to meet even the rational basis test utilized in the broad run of equal protection challenges. *See, e. g.,* Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Reed v. Reed, *supra.* In applying this test, we must ask whether the statutory preference in favor of native-born citizens, whatever their length of residence in the United States, over citizens naturalized for less than 10 years has a "fair and substantial relation to the object of the legislation." Reed v. Reed, *supra,* 404 U.S. at 76, 92 S.Ct. at 254, 30 L.Ed.2d 225, *quoting* Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). *See also* Eisenstadt v. Baird, *supra,* 405 U.S. at 446–447 & n.7, 92 S.Ct. 1029, 31 L. Ed.2d 349.

At first blush, it might seem that Section 515 is at least "rationally related" to the objective of ensuring that For-

eign Service officers are sufficiently knowledgeable about American life to serve as adequate representatives of our country. It might well be reasonable to assume that many just-naturalized citizens lack the requisite familiarity with the United States to serve her abroad and at home in intricate matters of foreign policy. The fact that a sweeping employment qualification may have some support in the broad run of cases is often sufficient to uphold it across the board. *See* Ferguson v. Skrupa, 372 U. S. 726, 732–733, 83 S.Ct. 1028, 10 L.Ed. 2d 93 (1963). However, it is impossible to ignore the contrary intimations of Reed v. Reed, *supra,* a case involving Idaho's automatic preference for men over women as executors of intestates' estates. There, in applying the restrained standard of equal protection review, 404 U.S. at 76, 92 S.Ct. 251, 30 L. Ed.2d 225, Mr. Chief Justice Burger's opinion for a unanimous Supreme Court indicated that automatic preferences for state-granted kinds of employment could not be based purely on a feature over which a person has had no control. *Id.* at 76–77, 92 S.Ct. 251, 30 L.Ed.2d 225. I find this logic equally compelling here where, as in *Reed,* there is no proffered factual basis, except apparently blind assumption, supporting the exclusionary classification at issue.

Moreover, in my view it is simply unrealistic to look at the statute as if it stood isolated in some sort of vacuum. As pointed out earlier, Section 515 must be read in the context of a broader statutory scheme of regulating entry into the diplomatic corps. The centerpiece of this scheme is the provision for a system of competitive written and oral examinations. 22 U.S.C. §§ 911, 912 (1970). Without this finely tuned examination system, we are safe in assuming, Foreign Service officer recruitment would very possibly degenerate into a system giving undue preference to the rich and well connected and producing a less skilled Foreign Service. Multiple competitive examinations seem indispensable to assure fairness and the best possible Foreign Service. Thus the only sensible way to evaluate Section 515 is to ask whether it is a reasonable supplement to the examination system to which it is related.

When viewed in this light, I must conclude that it is not. At no point does the Government argue—nor have I found a scintilla of evidence in the legislative history—that Section 515 is needed as a screening device to avoid errors in the selection process based on the written and oral examinations. Certainly a different case might be presented if only written examinations were utilized. I can easily imagine that more than book learning is required for a Foreign Service officer to respond with intelligence and speed when confronted with a situation calling on him to discuss the subtleties of American life. But these qualities are adequately tested by the oral examinations, and the Government does not argue otherwise. Thus I conclude that Section 515 is most fairly characterized as a resource-saving device —a means of eliminating additional tests and time spent by interviewers and graders. But the possibility of administrative efficiency through an indeterminate saving of state resources, a rationale which the Government did not even raise, is hardly a rational basis on which to justify Section 515. *See* Reed v. Reed, *supra,* 404 U.S. at 76, 92 S.Ct. 251, 30 L.Ed.2d 225; Rinaldi v. Yeager, 384 U.S. 305, 309–310, 86 S.Ct. 1497, 16 L. Ed.2d 577 (1966).

It is conceivable, on the other hand, that Congress may have felt that written and oral examinations were not foolproof means to ensure that applicants would have the necessary information on and associations with America to represent her adequately abroad. This concern is evident in another part of the Foreign Service Act, Section 572, which provides that at least three of a Foreign Service officer's first 15 years shall be spent in the United States, 22 U.S.C. § 962 (1970), to safeguard against losing "touch with the American way of life." H.R.Rep.No.2508, 79th Cong., 2d Sess.,

77 (1946). With respect to applicants, some sort of durational requirement ensuring sufficient exposure to American culture and society seems comprehensible on similar grounds. But in my judgment, singling out naturalized citizens for a durational citizenship requirement that does not even require them to reside in the United States after they have become citizens is simply irrational. The extremely tenuous relation between the distinction drawn by Section 515 and its rationale is underscored by the law's inapplicability to persons who are citizens at birth and the absence of any requirement that members of this group reside in America for any period of time before becoming eligible for the Foreign Service examinations. There is nothing in the legislative history indicating that Congress was given any grounds to believe that citizens at birth who have spent their youths abroad and upon reaching adulthood became eligible for membership in the Foreign Service warranted an automatic, flat preference over foreign-born naturalized citizens who, in order to become citizens, have spent at least five years here. Nor is it easy to presume the existence of facts supporting a bright-line exclusion of this sort. *See* Reed v. Reed, *supra,* 404 U.S. at 77, 92 S.Ct. 251, 30 L.Ed.2d 225; *Cf.* Weber v. Aetna Casualty & Surety Co., *supra,* 406 U.S. at 173–174, 92 S.Ct. 1400, 31 L.Ed. 2d 768. This factor, when coupled with a total lack of argument that the testing program might be inadequate, further supports the conclusion that the statute's distinction is not even remotely "fair and substantial." Reed v. Reed, *supra.*

## VII

It is, therefore, ORDERED that the plaintiff's motion for summary judgment be, and it is hereby, granted; and it is FURTHER ORDERED that the defendants' motion for summary judgment be, and it is hereby, denied; and it is ADJUDGED and DECLARED that 22 U.S.C. § 910 (1970) and the regulations adopted thereunder violate the Fifth Amendment to the Constitution of the United States; and it is ORDERED that the defendants, their agents, and their successors in office are hereby enjoined from denying the plaintiff the opportunity to take the Foreign Service officer qualifying examinations by reason of his failure to meet a durational citizenship requirement.

Judgment accordingly.

FLANNERY, J., concurs in the result and in Parts I, II, III, IV, V and VII of the court's opinion.

HART, District Judge (dissenting).

This case is before the Court on the narrow question of whether or not the ten year durational citizenship requirement of the Foreign Service Act of 1946, 22 U.S.C. § 910 is constitutional.

The majority hold that it is not because the act fails to meet its conception of the standards under the "compelling Governmental interest" test, which they deem applies to this act.

I disagree on two grounds. I believe the correct test to be applied is the "rational basis" test. Judge Flannery feels that this test, if it applied to the act, would be met, but that the more restrictive "compelling Governmental interest" applies.

It is my view that the act meets the requirements of the "compelling Governmental interest" test.

The "compelling Governmental interest" asserted by the defendant in this case is that of choosing the best possible representatives of this nation for the conduct and execution of the foreign policy of the United States in foreign nations.

There are over 3,000 Foreign Service officers who, when abroad, serve as diplomatic and consular officers and who, when in Washington, fill many of the most responsible positions in the Department of State. The duties of the Foreign Service officer call for a wide range of abilities and attributes. For-

eign Service officers must possess strength of character and personality, combined with oral and written communications skills, knowledge of the history and culture of the American people, and an understanding of domestic and international issues. Foreign Service officers must relate United States interests and practices to the highly diverse and frequently conflicting ways of many other peoples.[1]

The Foreign Service officer, today, is among the most highly specialized and elite type of employee in the Federal Government.

When Congress enacted the Foreign Service Act of 1946, the aim of the act was to "improve, strengthen and expand the Foreign Service so that it may be adequate for the conduct of the foreign relations of the United States in the postwar world." The 1946 Act was the first major reorganization of the Foreign Service following a period characterized by Congressman Vorys of Ohio, a member of the House Foreign Affairs subcommittee which drafted the Bill, in this manner:

"Our Foreign Service was caught with its striped pants down in the wrong place by World War II. This bill is an attempt to correct the situation; it is based on the idea that from now on we must wage peace with the determined skill that we waged war, and that takes professionals, not political amateurs . . ."

92 Cong. Rec. 9588 (1946).

The legislative history of Section 515 of the Foreign Service Act of 1946, clearly shows that it was enacted to ensure that Foreign Service officers would be intimately acquainted with the "American way of life," the customs, manners, and mores of American socie-ty. The House Committee on Foreign Affairs report explains:

"Section 515 is analogous to the present provision of law with regard to the subject [46 Stat. 1208 (1931)] except the requirement as to length of citizenship is reduced from 15 to 10 years. Ten years should be sufficient time to permit an individual to become acquainted with the American way of life, particularly as in most cases he must have been a resident of this country for 5 years prior to naturalization. H.Rpt. No. 2508, 79th Cong., 2nd Sess. 61 (1946)."

Both the House and Senate reports on the Act show the importance Congress placed on having the Foreign Service officers sensitive to the cultural and social developments of this country.[2]

Plaintiff suggests that invidious discrimination exists between native-born and naturalized citizens because residency and not duration of citizenship is a better indicator of familiarity with the United States and American culture. Plaintiff points out that it is possible for a person born of American parents in a foreign country who has never been to the United States to be eligible for employment in the Foreign Service while a naturalized citizen of less than 10 years who had alien parents and has lived in the United States continuously since the day after his birth is ineligible. To adopt the plaintiff's argument and hypothetical example as controlling this case, the Court must make the decision Congress should have chosen residency as the eligibility requirement instead of duration of citizenship. This would be the same as saying that Congress was without the power to enact the distinction between native-born and naturalized citizens because, in the wis-

1. Memorandum; Board of Examiners for the Foreign Service; BEX–3, March, 1971.

2. *Re: Americanization*
There is perhaps no phase of Foreign Service administration about which there is more general agreement than that connected with the problems of insuring that Foreign Service personnel would come to the United States as often as possible to renew their knowledge of the developments in the United States and their feelings for the American way of life. H.Rpt.No.2508, 79th Cong., 2nd Sess. 10 (1946) and S.Rpt. No.1731, 79th Cong., 2nd Sess. 10 (1946).

dom of the Court, persons born of American citizens abroad typically English-speaking and observing United States customs and holidays in the home are less acquainted and less able to represent the United States as Foreign Service officers than are persons who have been United States citizens for ten years. Such a substitution of judicial judgment for Congressional judgment, this Court should be unwilling to make.

This is not to say that Congress is free when legislating under one of its enumerated powers to enact unreasonable classifications. But even under the strict judicial scrutiny of the "compelling governmental interest" test of constitutionality, this Court should not strike down a classification which has an entirely legitimate objective merely because the Court, in its infinite wisdom, thinks that residency would be a better classification than the duration of citizenship devised by the legislature and the executive.

In this context, it is important to note that the purpose of Section 515 is not mere administrative convenience as in Schneider v. Rusk, nor criminal punishment, nor a deprivation of fundamental rights. Section 515 is a policy decision of Congress, concurred in by the Executive, relating to the conduct of foreign affairs. The durational citizenship requirement for naturalized citizens is an eligibility criterion, essentially the same as the requirements imposed by the Constitution in Article I. Even though the constitutional history compels no particular result in this case, it does point up the fact that distinctions between native-born and naturalized citizens were considered appropriate in certain instances in the minds of the framers of the Constitution.[3] Under Article I, § 2, a naturalized citizen must wait seven years after he obtains citizenship before he is eligible to sit in the House of Rep-

resentatives. For the Senate, the waiting period under Article I, § 3, is nine years. These clauses no more impose a condition of second class citizenship than Congress imposes in Section 515.

In conclusion, Congress has determined that naturalized citizens are less acquainted and less knowledgeable of the United States and American culture than native-born citizens and upon that determination, it has enacted a statute which limits eligibility to serve in the Foreign Service of the United States. This eligibility requirement is without question in pursuit of an entirely legitimate objective of compelling interest to the Government in the conduct of foreign affairs, and unless this Court decides to return to the era long past when under the rubric of due process the Federal Courts sit in review of the wisdom of Congressional decisions on national policy, then Section 515 should be upheld.

---

3. *See:* Calvin's Case, 7 Co.Rep. 1a, 77 Eng.Rep. 377 (1609), which clarified the concept of citizenship and naturalization adopted by James Madison in debates over the Constitution; II Farrand, The Records of the Federal Convention of 1787, 235 (1901); The Federalist No. 62 (J. Cooke, ed. 1961); 1 Annals of Congress 1112 (1790).