**Pedro AMEZQUITA, represented by his father Felipe Amezquita, et al., Plaintiffs,**

v.

**Rafael Hernandez COLON, Governor of the Commonwealth of Puerto Rico, et al., Defendants.**

**Civ. No. 74–396.**

United States District Court, D. Puerto Rico.

July 22, 1974.

Pedro Varela, Puerto Rico Legal Services, Hato Rey, P. R., for plaintiffs.

Arturo Diaz, Dept. of Justice, Commonwealth of P. R., Old San Juan, P. R., for defendants.

## OPINION AND ORDER

TOLEDO, Chief Judge.

This is an action filed pursuant to the Civil Rights Act, Title 42, United States Code, Sections 1983, 1985 and 1986, and the Declaratory Judgment Act, Title 28, United States Code, Sections 2201 and 2202, seeking damages and declaratory

and injunctive relief. Jurisdiction is claimed under Title 28, United States Code, Section 1343 and under Title 28, United States Code, Section 2201. Plaintiffs are residents of a squatter community called interchangeably as "Villa Pangola" or "Villa Ibañez", located in the Municipality of Toa Baja, Puerto Rico.

Defendants in this case include, among others, Rafael Hernandez Colon, Governor of the Commonwealth of Puerto Rico; Francisco de Jesus Schuck, Secretary of Justice of the Commonwealth of Puerto Rico; Jose E. Arraras, Secretary of the Housing Department of the Commonwealth of Puerto Rico, his subordinates, Agustin Miranda, Ildefonso Mora, Hector Diaz, Cruz M. Malave and Jose Rolon; Fausto Olano, Executive Director of the Land Authority of the Commonwealth of Puerto Rico; and other officials and employees of the executive Branch of the Commonwealth of Puerto Rico. Also, Ramon Ibañez, Mayor of the Municipality of Toa Baja was included as a defendant in the amended complaint filed by plaintiffs.

In the amended complaint,[1] plaintiffs allege that their homes and personal belongings were destroyed by defendants, their agents, and/or employees on April 2, 1974, through the use of force without any judicial authorization. It is also alleged that on the same date their homes were illegally searched and their cooking stoves, sleeping facilities, clothes, working tools and similar facilities were seized by defendants, their agents and/or employees. Furthermore, plaintiffs allege that defendants violated their rights to the equal protection of the laws under the Constitution of the United States since defendants have subjected them to a different treatment based on the mere fact that their community was established after January 18, 1973. Plaintiffs contend that they

are being subjected to civil and criminal proceedings, that their homes are being destroyed and are not being offered utility services such as electricity, water and garbage collection for the mere reason that they invaded government land after January 18, 1973. On the other hand, plaintiffs contend that squatters' communities established before January 18, 1973, are being provided with the aforementioned services and their members are not being civil or criminally prosecuted. Furthermore, plaintiffs allege that in other instances the Commonwealth Government consents to the relocation of squatters' communities established prior to the above mentioned date, specifically in those cases in which they might have invaded land where important government projects had already been planned. This type of governmental action, plaintiffs assert, is arbitrary and discriminatory, violating their right to the equal protection of the laws.

On April 8, 1974, the Honorable Hernán Pesquera, U.S. District Judge, issued a temporary restraining order enjoining defendants from destroying plaintiffs' homes and personal belongings without a judicial order and from interfering with plaintiffs' right to privacy. The temporary restraining order was subsequently vacated by the Court on April 18, 1974.

Besides the hearings held on the case, the Court performed an ocular inspection on the site of "Villa Pangola". On agreement by the parties, the hearings for the petition for preliminary injunction and the permanent injunction were consolidated and it was also agreed that the issue of damages would be left for further hearings, if needed.

Early in the consolidated hearing, the Court certified two classes; one included those plaintiffs still residing in the community and the other composed of those plaintiffs that suffered property

---

1. Plaintiffs amended their complaint at the beginning of the hearing for the preliminary and permanent injunction before defendants had answered the original complaint and after the Court had granted permission to plaintiffs. See, Rule 15 of the Rules of Civil Procedure.

damage because of defendants' actions. Defendants filed a motion to dismiss on April 17, 1974, and said motion is herein denied for the reasons stated below. The answer to the amended complaint was filed on April 29, 1974.

From the oral testimony of all witnesses, including that of some of the plaintiffs and some of the defendants, from the appreciation of all the documentary evidence presented, as well as the Court's own observations in the ocular inspection of the area, and after a careful consideration of the evidence, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiffs and their classes are members of a group of squatters who occupied part of a farm owned by the Land Authority of the Commonwealth of Puerto Rico and which is located at Ward Candelaria in the Municipality of Toa Baja, Puerto Rico.

2. On or before January 18, 1974, part of the farm owned by the Land Authority of the Commonwealth of Puerto Rico was occupied by members of the class represented by the plaintiffs who have been in possession of the same since then until April 29, 1974, when the Court inspected the area. During the ocular inspection, the Court saw houses, shacks and sundry structures built in the farm, which is popularly referred to as "Villa Pangola" or "Villa Ibañez". The Court also observed some spring mattresses, stoves, new metal windows, new zinc boards and other similar personal property dispersed as debris in various parts of the farm.

3. Defendants Cruz M. Malave and Jose Rolon, officials of the Housing Department of the Commonwealth of Puerto Rico and Jorge L. Rivera, official of the Land Authority of the Commonwealth of Puerto Rico, visited the squatter community twice before April 2, 1974 and tried to persuade the squatters to abandon the farm voluntarily.

4. On January 29, 1974, an injunction petition against herein plaintiffs was filed by the Land Authority of the Commonwealth of Puerto Rico, agency headed by defendant Fausto Olano, in the case of Autoridad de Tierras v. Pablo Rivera, et als., Civil No. 74–187, Superior Court of the Commonwealth of Puerto Rico, Bayamon Section. The petition sought, among other things, to have plaintiffs enjoined from entering the farm and to have the structures that plaintiffs might have constructed in the farm to be removed therein. The Superior Court of Bayamon set the case for hearing for April 3, 1974 at 9:00 a. m. to determine whether the injunction should be issued. In other words, the destruction of the property was ordered for the day before the hearing of the injunction petition. Why this was done, has not been explained by the defendants.

5. About the same date, criminal charges were filed by members of the Police Department of the Commonwealth of Puerto Rico, headed by defendant Astol Calero, and by representatives of the Land Authority of the Commonwealth of Puerto Rico, against plaintiffs for having violated the provisions of Article 371 of the Penal Code of the Commonwealth of Puerto Rico, Title 33, Laws of Puerto Rico Annotated, Section 1442, as amended by Law No. 6 of March 10, 1972, which deals with land invasions.[2]

2. Title 33, Laws of Puerto Rico Annotated, Section 1442, as amended by Law No. 6 of March 10, 1972, reads as follows:

"Every person entering upon or detaining any lands, or another person's lands for the purpose of performing acts of ownership or possession upon them, shall be guilty of a misdemeanor and upon conviction thereof punished by imprisonment in jail for a term of not more than six (6) months, nor less than three (3) months, or by a fine of not more than five hundred (500) dollars, nor less than two hundred (200) dollars. Provided that the court shall suspend the effects of the judgment if the defendant, within a term of not more than five (5) days, removes all the buildings he may have constructed or may have ordered to be constructed from the lands he entered upon, and abandons the occupancy and/or posses-

6. Defendants Agustin Miranda, an official of the Housing Department of the Commonwealth of Puerto Rico, and Fausto Olano, Executive Director of the Land Authority of the Commonwealth of Puerto Rico, met on several occasions prior to April 2, 1974, to determine the manner by which the tract of land occupied by plaintiffs and where plaintiffs had built their homes would be "cleaned" from structures that were not inhabited and that did not present any "sign of life". They agreed to use bulldozers, trucks and personnel from both governmental agencies to "clean" the tract of land. They further agreed that the presence of members of the Police Department of the Commonwealth of Puerto Rico was to be requested so that no "incidents" might occur during the "cleaning" operations.

7. No judicial order was sought by any of the defendants in order to carry out this cleaning operation.

8. Lt. Luis Santiago, Commanding Officer of the Police Department in the Toa Baja municipality, was requested to offer help in the "cleaning" operation by having police officers present on April 2, 1974, the day when the same would take place. Defendant Rafael Melia, Zone Commander of the Area of which Lt. Santiago supervises, gave specific instructions to the latter to be present at "Villa Pangola" (Villa Ibañez) on that date.

9. At the same time, defendant Cruz Malave, official of the Housing Department of the Commonwealth of Puerto Rico, agreed with Jose L. Muñoz Roure, an official of the Land Authority of the Commonwealth of Puerto Rico, that the Land Authority would send two bulldozers, two trucks and several employees of that agency to carry out the "cleaning" operations.

10. Hector Diaz, counsel for the Housing Department of the Commonwealth of Puerto Rico, was present at Villa Pangola on April 2, 1974 in order to dialogue with counsel of the squatters if any appeared.

11. In the morning of April 2, 1974, Lieutenant Santiago, in command of twenty-two policemen and aided by defendant Sgt. Nelson Martinez, went to the farm in government-owned vehicles. Defendant Police Officer Rivera, Badge Number 252, was also part of the group of police officers present on that date. Also, defendants Agustin Miranda, Cruz M. Malave and Jose Rolon participated in the "cleaning" operations together with the above mentioned police officers and the employees of the Land Authority of the Commonwealth of Puerto Rico.

12. The presence of the Police was aimed at avoiding confrontation and preserving public peace.

13. On April 2, 1974, some structures in Villa Pangola (Villa Ibañez) were inhabited by human beings. Other structures were being built so that human beings might occupy them, but no one was living in them at the time. Some other structures were occupied for different purposes, such as cooking facilities, warehouses, etc.

sion of same. In such cases where the defendant before or during the hearing of the case submits evidence averring that he has removed the structure or structures built or has abandoned the occupancy and/or possession of the property entered upon, the court shall order the dismissal of the case.

Every person instigating another person to enter upon or occupy any lands or another person's property shall be guilty of a felony and, upon conviction thereof, punished by imprisonment in a penitentiary for not more than two (2) years nor less than six (6) months.

Every person entering another person's domicile without the express consent of the owner, possessor or agent or who in any manner intervenes in such domicile altering it, performing acts of ownership or modifying it or attempting to make thereto any repairs whatsoever, except also in the cases and in the manner provided by law, shall be punished by imprisonment in jail for not more than six (6) months, nor less than three (3) months, or by a fine of from two hundred (200) to five hundred (500) dollars."

14. No previous notice was given to the residents of Villa Pangola (Villa Ibañez) by any of the defendants that the farm was going to be "cleaned" on April 2, 1974 of structures that were not inhabited.

15. Plaintiff Olga Margarita Rivera was inside her home with her six-month child when one of the bulldozers destroyed an adjacent structure belonging to her and to her husband which was used as a kitchen and dining room.

16. An elderly female plaintiff was inside her home during the "cleaning" operations and defendant Agustin Miranda spoke to her and stayed with her for about ten minutes. This structure was not destroyed by defendants.

17. In the process of finding out by defendants whether the structures that were to be destroyed were inhabited, some of plaintiffs' rights to privacy were violated since these plaintiffs were inside their homes when defendants Cruz M. Malave and Jose Rolon looked inside through doors, windows and other places to see whether any of the homes were inhabited.

18. It is clear that persons lived in some of the structures that were destroyed even though no one was inside them at the moment the structures were bulldozed by defendants' employees and officials of the Housing Department and the Land Authority under the orders of defendants Cruz M. Malave, Jose Rolon and Agustin Miranda.

19. A public policy approved on January 18, 1973, by defendants Rafael Hernandez Colon, Governor of the Commonwealth of Puerto Rico; José E. Arraras, Secretary of the Housing Department of the Commonwealth of Puerto Rico and Francisco de Jesus, Secretary of Justice of the Commonwealth of Puerto Rico, establishes, in substance, that all those persons that invade government land after January 18, 1973 would be charged with violating Article 371 of the Penal Code of the Commonwealth of Puerto Rico and civil proceedings would be initiated against such persons in the Courts of the Commonwealth of Puerto Rico. Also, government officials would try to persuade these squatters to abandon the invaded property and only if the land that has been invaded is cleared, court proceedings would be dismissed.

20. On the other hand, the same policy of the Commonwealth of Puerto Rico establishes that squatters that may have invaded government land before January 18, 1973, would not be forced to abandon the invaded property unless a governmental project such as a road, school construction, etc., would be affected. In that case, the squatters would be relocated and would receive assistance for this purpose from the Commonwealth authorities. The rest of the squatters that have invaded government land before January 18, 1973, if such land is not earmarked for an important public project, would receive government help in the way of having the roads of the community paved, utility services such as electricity, water and garbage collection offered, and other similar services provided from the Commonwealth and Municipal authorities. Also, criminal and/or civil cases against these squatters are not being filed and/or are being dismissed at the request of the Commonwealth authorities.

21. Following this public policy, defendants have undertaken "cleaning" operations in squatter communities established after January 18, 1973 in the municipality of Canovanas and in Tortugueros, Puerto Rico, besides the one in the present action.

22. From the position established by the record of the case and from the position of the defendants, it is likely that, save for the issuance of an injunction, defendants will continue to act as they have been acting up to this moment.

In view of the aforesaid Findings of Fact, the Court enters the following:

## CONCLUSIONS OF LAW

This is not the first time that this Court is called upon to determine liabili-

ty under the Civil Rights Statutes for similar acts to the ones carried out by defendants in this case.[3] See Caballero v. Ferre, Memorandum Opinion, unreported Civil No. 598–71, District Court of Puerto Rico (Cancio, C. J.), decision entered on September 22, 1972; Santiago-Rodriguez v. Torres-Massa, 342 F. Supp. 1152 (D.C.P.R.1972). In *Caballero*, better known as the Villa Margarita case, this Court issued an injunction against one of the defendants, a police officer, for acts which the Court determined constituted violations to therein plaintiffs' civil rights as protected by the Constitution of the United States. Caballero v. Ferre, supra, at pages 2 to 16. Plaintiffs in the Villa Margarita case were also squatters that had invaded part of a privately owned farm. A member of the Police Force of the Commonwealth of Puerto Rico in command of the municipality where the farm in question was located ordered some police officers to be present when a "cleaning" operation of the farm would take place by representatives of the owner. In the process of "cleaning" the farm, named Villa Margarita by its occupants, the Court determined that some of therein plaintiffs' civil rights had been violated and injunctive relief was granted. Caballero v. Ferre, supra, see the Preliminary Injunction Order. Cf. Santiago-Rodriguez v. Torres-Massa, supra.

The invasion and appropriation of land by squatters in Puerto Rico stems from very complex social and economic phenomena all of which make themselves felt in the existence of inadequate housing facilities for the poor. This Court is not concerned at this moment with the illegality of such invasions but rather must limit itself to two basic and proven facts in reaching a final disposition of this case: First, that the various homes and structures which make up Villa Pangola or Villa Ibañez belong to

herein plaintiffs and that some of them were destroyed on April 2, 1974 without any judicial order having been previously obtained by defendants. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Secondly, said structures constitute the homes of some of plaintiffs and as such herein plaintiffs are entitled to the constitutional protections against invasions of privacy and against deprivation of property without due process of law. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1965).

In Lynch v. Household Finance, supra, the Supreme Court brought property rights under the protective coverage of the Civil Rights Act, Title 42, United States Code, Section 1981 et seq. Hence, once ownership of the homes and structures destroyed on April 2, 1974 is established, as it has been, defendants become liable under the pertinent provisions of the Civil Rights Act. See also Ortega v. Municipality of Bayamon, Civil No. 126–72, decision entered on January 29, 1974 (D.C.P.R.1974); Ihrke v. Northern States Power Co., 459 F.2d 566 (8 Cir. 1972). In respect to the property right violations, it must be pointed out that the Court deems it irrelevant that some of the homes and structures destroyed on April 2, 1974, were not occupied at the moment the bulldozer moved upon them. Though defendants rely on this fact and on the fact that efforts were made not to destroy homes that showed "sign of life", the Court considers that the violent destruction without judicial order of the structures in Villa Pangola constituted a violation of the property rights of those plaintiffs that owned them. Lynch v. Household Finance, supra.

Defendants' violation of plaintiffs' rights to privacy and physical and personal integrity is twofold. A man's

---

3. Jurisdiction is thus properly asserted in this case under the Civil Rights of 1871, Title 42, United States Code, Section 1983 et seq. and its jurisdictional counterpart, Title 28, United States Code, Section 1343 as well as Title 28, United States Code, Section 2201. See, e. g. Marin v. University of Puerto Rico, 346 F.Supp. 470 (D.C.P.R. 1972); Vistamar, Inc. v. Vazquez, 337 F. Supp. 357 (D.C.P.R.1971).

home is constitutionally protected from violent and illegal intrusions by persons acting under "color of state law", Monroe v. Pape, supra, and that principle certainly extends to unauthorized and violent total destruction of a man's abode. Caballero v. Ferre, supra. Defendants had and still have various legal remedies to seek the lawful removal of the homes and structures which constitute Villa Pangola or Villa Ibañez and though this Court is aware of the difficulties of applying such remedies to a whole community, this Court cannot find any justification for the judicially uncontrolled destruction of property which ultimately serves as a living quarters for some of plaintiffs and their families. See Article 370 of the Civil Code of Puerto Rico, Title 31, Laws of Puerto Rico Annotated, Section 1444. Also see Article 375 of the Civil Code of Puerto Rico, Title 31, Laws of Puerto Rico Annotated, Section 1461.[4] Similarly, the practice on the part of some of the defendants of looking into and poking through the homes of some of the plaintiffs without a search warrant or judicial authorization of any kind before ordering the bulldozers to destroy some of the unoccupied structures constitutes an invasion of privacy. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The principles which guided this Court in Caballero v. Ferre, supra, are equally controlling here:

"It is plaintiffs' right to their personal and physical integrity, to have the sanctity and privacy of their homes inviolate and their right to live without the threat of being thrown out on the streets, which is protected by this Court. . .

It is no less an assault on a person to be driven from his home by a po-lice-directed and-protected bulldozer as it is to have police enter the home of the person and ramsack it without a court order as happened in Monroe v. Pape, 365 U.S. 167 [81 S.Ct. 473, 5 L. Ed.2d 492] . . .

It is the 'sanctity of a man's home' [Griswold v. Conn., 381 U.S. 479, 484 [85 S.Ct. 1678, 14 L.Ed.2d 510]] which concerns the Court and which was violated in a farm in Trujillo Alto. It was shown to the Court's satisfaction that some of the shacks were lived in by the families of some of the members of the class of plaintiffs. These homes are protected from police interference under the Civil Rights Act in much the same way as the physical integrity of the individual is". Caballero v. Ferre, at pages 6, 7 and 8.

■ A man need not oppose himself violently in front of persons acting "under color of state law" before his home is destroyed, in order to seek the protective coverage of the Constitution. His property rights and his rights to privacy are not pendent inevitably on his presence when state officials move in to destroy what constitutes his living quarters. The Court reiterates once more the principle established in Caballero v. Ferre, supra, at page 8:

"It does not matter to whom the land belongs. The owner has his remedies under the Civil Code and the Code of Civil Procedure of Puerto Rico. Under very exceptional circumstances can violence, uncontrolled by judicial restraint, be used to make an individual act against his will. The laws of the Commonwealth of Puerto Rico have adopted this principle in the Civil Code of Puerto Rico, Sections 1444 and 1461. These provisions follow the public policy that in order to

---

4. Title 31, L.P.R.A., Section 1441, reads as follows :

"Possession is acquired either by the material occupation of the thing or the right possessed, or by the fact that they remain subject to the action of the will, or by the proper acts and legal formalities established for acquiring such right."

Title 31, Laws of Puerto Rico Annotated, Section 1461, reads as follows :

"Every possessor has a right to be respected in his possession; and if he be disturbed therein, he shall be protected or reinstated in such possession by the means established in the laws of procedure."

avoid confrontation inherent in removing a person from his possession, judicial intervention is required."

Plaintiffs also allege in their amended complaint violations to their right to the equal protection of the laws. Plaintiffs contend that the crux of their allegations is that the policy in question discriminates among said communities based solely on the fact of the arbitrary set date of January 18, 1973. Squatters' communities established in government property before that date have received the official blessing in that defendants have sought for them all the basic governmental services, including garbage collection, water, electricity and road pavement if no interference with a public government project existed.

■ Laws are usually based on classifications of persons or property. Such classifications are not per se violative of equal protection. The only constitutional requirement is that any disparity in treatment caused by such classification be reasonable. Hitchcock v. Collenberg (D.C.Md.1956), 140 F.Supp. 894, affirmed 353 U.S. 919, 77 S.Ct. 679, 1 L. Ed.2d 718; Feinerman v. Jones (D.C. Pa.1973), 356 F.Supp. 252; Faruki v. Rogers (D.C.D.C.1972), 349 F.Supp. 723; Green v. Waterford Board of Education (D.C.Conn.1972), 349 F.Supp. 687.

The standards traditionally utilized by the United States Supreme Court in determining the reasonableness of a statutory classification are as follows:

(a) Whether the classification itself is a rational one;

(b) Whether the classification bears a reasonable relationship to a proper legislative purpose;

(c) Whether all persons within the classes established are treated equally.

■ In recent years, the Supreme Court has employed a stricter test where the classification is based on "suspect criteria" or where the classification restricts some fundamental right. Where those are involved, the classification must not only meet the standards of the traditional test of the reasonableness as pointed above, but there must be a *compelling state interest* served by the classification. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

In re Application of Griffiths, 413 U. S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), the Court stated the following:

"The Court has consistently emphasized that a State which adopts a suspect classification 'bears a heavy burden of justification,' McLaughlin v. Florida, 379 U.S. 184, 196 [85 S.Ct. 283, 290, 13 L.Ed.2d 222] (1964), a burden which, though variously formulated, requires the State to meet certain standards of proof. In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial [Loving v. Virginia, 388 U.S. 1 (87 S.Ct. 1817, 18 L.Ed.2d 1010), compelling Dunn v. Blumstein, 405 U.S. 330 (92 S.Ct. 995, 31 L.Ed.2d 274)], and that its use of the classification is 'necessary to the accomplishment' of its purpose or the safeguarding of its interest."

■ In any event the first criterion which must be established to support any statutory classification is that it be *rational*—based on factors which justify disparate treatment.

■ The Court has recognized a presumption which operates in favor of the reasonableness of legislative classifications. If any state of facts can reasonably be conceived that would justify the classification, the existence of those facts will be assumed by the Court to be the basis for the classification in order to uphold the legislation. Lindsley v. Natural Carbonic, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The presumption is not applied where the classification affects "fundamental rights". A classification which would confer; fundamental rights on some while denying it to others, is suspect, and, conse-

quently, subject to close scrutiny. No presumption exists in its favor. Kramer v. Union Free School District, 393 U.S. 818, 89 S.Ct. 117, 21 L.Ed.2d 90 (1969). Furthermore, to be valid, such classifications must be *necessary*, not merely reasonably related to, the object of the legislation. McLaughlin v. Florida, supra. In the final analysis the Court determines the reasonableness of the classifications on broad policy lines—i. e. whether in its opinion the prevailing social, economic and historic factors involved justify the classification and disparity resulting therefrom.

■ In ascertaining the purpose of the statute, the Court focuses not only on the *terms of the statute, but also the context in which it was enacted and its operative effect—both legal and practical.* *Some reasonable* relationship must exist between the purpose and the classification adopted by the statute. Usually, however, all that need be shown is that the classification adopted in the statute is not based on reasons totally unrelated to the purpose of the statute. As long as there is a sufficient relationship with a proper legislative purpose, the statute usually will be upheld, even though other purposes might be attributed to the statute which would be improper.

■ The analysis of the jurisprudence above made, forces us to determine whether the Commonwealth Government had any compelling state interest when it promulgated this public policy. In trying to make this determination, the Court finds itself in a very difficult position due to the lack of evidence in this respect. The Court feels that it would be rather unjust and unfair to try to reach a decision as to whether the Commonwealth Government had any compelling state interest in promulgating this public policy with the almost total lack of evidence to that respect.

For the above stated reasons, the Court at this moment declines to enter a decision in this respect and elects to leave this question open until after the parties are given an opportunity to either inform the Court if it is strictly necessary for the Court to decide this issue, and if so, whether an evidentiary hearing would be required. Should an evidentiary hearing be required the parties should so inform the Court, and the Court will proceed to set a hearing to that effect.

For the aforementioned reasons, it is hereby

Ordered, that the defendants Jose Enrique Arraras, Agustin Miranda, Cruz M. Malave, Jose Rolon, Fausto Olano and Commander Rafael Melia, their agents, employees and successors in office, are hereby restrained from violating the civil rights of herein plaintiffs and the class they represent by destroying plaintiffs' property and invading plaintiffs' privacy without previously obtaining a judicial order to that effect. Plaintiffs' petition for injunction because of discriminatory acts and unequal protection of the law allegedly performed by the Commonwealth Government is left pending subject to the parties informing the Court whether it is strictly necessary for the Court to decide this issue, and if so, whether an evidentiary hearing would be required.

It is so ordered.