Nancy **KREITZER**, Plaintiff,

v.

**PUERTO RICO CARS, INC.** et al., Defendants.

Civ. No. 786–73.

United States District Court, D. Puerto Rico.

June 3, 1975.

Harvey B. Nachman, Nachman, Feldstein & Gelpi, San Juan, P. R., for plaintiff.

Elí B. Arroyo, Géigel, Silva, Soler Favale & Arroyo, San Juan, P. R., for defendants.

## OPINION AND ORDER

TOLEDO, Chief Judge.

This complaint was filed on August 30, 1973. In it plaintiff alleges that on May 23, 1973 while she was in her own vehicle, riding as a passenger, she was injured when said car was struck by a 1973 Ford LTD operated by Juan J. Garcia, who had leased said vehicle from the defendants Puerto Rico Cars, Inc. and Hertz Rent-A-Car, which were the owners thereof. As a result of the foregoing, the plaintiff became sick, sore, lame and disabled, suffering injuries, was compelled to undergo hospital and medical services, and will be compelled to undergo future medical, hospital and surgical treatment.

Plaintiff also sued Insurance Company of North America which was the insuror of Hertz Rent-A-Car, the parent corporation, and all the local subsidiaries at the moment the accident occurred.

Jurisdiction was invoked under the diversity provision, Title 28, United States Code, Section 1332.

On October 15, 1973, defendant filed a motion requesting a non-resident bond since the plaintiff was a resident of the State of Maryland. Plaintiff opposed said motion on October 18, 1973, alleging that the requirement that non-residents post a bond for costs denies the non-residents the privileges and immunities of citizenship and violates their right to the equal protections of the laws, affecting also their right to travel.

As a result thereof plaintiff, in the case at bar, is attacking the constitutionality of this Court's local rule requiring non-residents to post a bond.[1]

■ Rule 83 of the Federal Rules of Civil Procedure reads as follows:

"Each district court by action of a majority of the judges thereof may, from time to time, make and amend rules governing its practice not inconsistent with these rules. Copies of rules and amendments so made by any district court shall, upon their promulgation, be furnished to the Supreme Court of the United States. In all cases not provided for by rule, the district courts may regulate their practice

---

1. Until May 31, 1974, the rule regulating the non-resident bond was Rule 6, which provided as follows:

"Rule 6—Security for Costs—
The Court may, on motion or of its own initiative, order any party plaintiff to file a bond or make a cash deposit as security for costs in such amount and so conditioned as the Court may designate. Provided, that no deposit for costs may be required of poor persons who, under the Acts of Congress are permitted to commence civil actions without the prepayment of fees or costs. Provided, further, that in any action commenced by such poor persons there shall be deposited with the Clerk from any amount recovered in said action such amount to cover fees and costs as may be allowed by the Court."
From June 1, 1974, the Rule regulating non-resident bond is Rule 5, which states:
Rule 5—Nonresident Bonds—
When the plaintiff is domiciled outside of Puerto Rico or is a foreign corporation, a

bond shall be required to secure the costs, expenses and attorneys' fees which may be awarded. All proceedings in the action shall be stayed until bond is given, which shall not be less than *five hundred dollars* ($500.00). The Court may require an additional bond upon a showing that the original bond is not sufficient security, and stay the proceedings in the action until such additional bond is given.

After the lapse of ninety (90) days from the service of the order requiring bond or additional bond, without the bond having been given, the Court may dismiss the action.

This rule shall be liberally interpreted in favor of the plaintiff so as not to preclude his right to sue through excessive bond requirement. Consistent with this, the Court, for good cause shown, may dispense with this requirement."

in any manner not inconsistent with the rules."

Where there is no controlling Federal statute, a district court may, by virtue of Rule 83, deal with the matter by local rule;[2] which *may* refer to and adopt state practice or the court may regulate the matter in any just manner which is not inconsistent with the Federal rule. See *Brewster v. North American Van Lines, Inc.*, 461 F.2d 649 (7 Cir. 1972); *Russell v. Cunningham*, 233 F.2d 806 (9 Cir. 1956); *Levine v. Bradlee*, 248 F.Supp. 395 (E.D.Pa.1965); *McClure v. Borne Chemical*, 292 F.2d 824 (3 Cir. 1961).

The general solution to the problem as to whether a party (usually a non-resident plaintiff) should be required to give security for costs can be found in Rule 83. See also *Azarow v. Sherneth Corporation*, 8 F.R.D. 247 (S.D.N.Y.1948); *Cary v. Hardy*, 1 F.R.D. 355 (E.D.Tenn.1940).

■ Various grounds for requiring security for costs will be found in the statutes. For example, security may be required where the plaintiff does not own, within the state, property out of which costs could be made by execution. The manifest purposes of a rule requiring non-residents to furnish security for costs is to insure to the defendant and to the officials of the court the payment of costs which may be awarded against a plaintiff against whom the court has no means of enforcing a collection, *Outlaw v. Pearce*, 176 Va. 458, 11 S.E.2d 600, to have within reach of process of the court some financially responsible person who is bound therefor, *Myrus v. Commonwealth Fuel Co.*, 120 Misc. 201, 198 N.Y.S. 1. A further object is to protect a party from being harassed with groundless suits. *Moore v. Banner*, 39 N.C. 293; *Leslie One-Stop In Pennsylvania, Inc. v. Audiofidelity,*

*Inc.*, 33 F.R.D. 16 (S.D.N.Y.1963); *A and R Theatre Corp. v. Azteca Films, Inc.*, 32 F.R.D. 47 (S.D.N.Y.1962).

## I. EQUAL PROTECTION AND THE RIGHT TO TRAVEL

■ Laws are usually based on classifications of persons or property. Such classifications are not per se violative of equal protection. The only constitutional requirement is that any disparity in treatment caused by such classification be reasonable. *Hitchcock v. Collenberg* (D.C.Md.1956), 140 F.Supp. 894, affirmed 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718; *Feinerman v. Jones* (D.C.Pa.1973), 356 F.Supp. 252; *Faruki v. Rogers* (D.C.D.C.1972), 349 F.Supp. 723; *Green v. Waterford Board of Education* (D.C.Conn.1972), 349 F.Supp. 687; *Amezquita v. Hernandez-Colon*, 378 F.Supp. 737 (D.C.P.R.1974).

■ The standards traditionally utilized by the United States Supreme Court in determining the reasonableness of a statutory classification are as follows:

(a) Whether the classification itself is a rational one;

(b) Whether the classification bears a reasonable relationship to a proper legislative purpose;

(c) Whether all persons within the classes established are treated equally.

■ In recent years, the Supreme Court has employed a stricter test where the classification is based on "suspect criteria" or where the classification restricts some fundamental right. There those are involved, the classification must not only meet the standards of the traditional test of the reasonableness as pointed above, but there must be a *compelling state interest* served by the classification. *Shapiro v. Thompson,*

---

2. We have found that the following Federal District Courts through a local rule require a non-resident plaintiff to post a bond: Eastern District of Illinois—Rule 2(a); District Court of Montana—Rule 14(b)(1); District Court of North Dakota—Rule 25(2)(a); District Court of South Dakota—Rule 8; District Court of Wisconsin—Rule 2(a); Eastern District Court of Pennsylvania—Rule 35(a); Western and East-

ern District Court of Arkansas—Rule 4(a); Northern District Court of Georgia—Rule 7(a); District Court of Maryland—Rule 5; District Court of Minnesota—Rule 2; District Court of Nebraska—Rule 11; Northern District Court of Indiana—Rule 4(a).

For a discussion of the statutes of various jurisdictions see Annotation 84 A.L.R. 252.

394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

In *Re Application of Fre Le Pole Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), the Court stated the following:

"The Court has consistently emphasized that a State which adopts a suspect classification 'bears a heavy burden of justification.' *McLaughlin v. Florida*, 379 U.S. 184, [196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222] (1964), a burden which, though variously formulated, requires the State to meet certain standards of proof. In order to justify the use of a suspect classification a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest."

█ In any event the first criterion which must be established to support any statutory classification is that it be *rational* —based on factors which justify disparate treatment.

█ The Court has recognized a presumption which operates in favor of the reasonableness of legislative classifications. If any state of facts can reasonably be conceived that would justify the classification, the existence of those facts will be assumed by the Court to be the basis for the classification in order to uphold the legislation. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The presumption is not applied where the classification affects "fundamental rights". A classification which would confer fundamental rights on some while denying it to others, is suspect, and, consequently, subject to close scrutiny. No presumption exists in its favor. *Kramer v. Union Free School District*, 393 U.S. 818, 89 S.Ct. 117, 21 L.Ed.2d 90 (1969). Furthermore, to be valid, such classifications must be *necessary*, not merely reasonably related to the object of the legislation. *McLaughlin v. Florida*, supra. In the final analysis the Court determines the reasonableness of the classifications on broad policy lines—i. e. whether in its opinion the prevailing so-

cial, economic and historic factors involved justify the classification and disparity resulting therefrom.

█ In ascertaining the purpose of the statute, the Court focuses not only on the *terms of the statute, but also the context in which it was enacted and its operative effect—both legal and practical. Some reasonable* relationship must exist between the purpose and the classification adopted by the statute. Usually, however, all that need be shown is that the classifications adopted in the statute are not based on reasons totally unrelated to the purpose of the statute. As long as there is a sufficient relationship with a proper legislative purpose, the statute unusually will be upheld, even though other purposes might be attributed to the statute which would be improper.

Very closely related to the constitutional provision of the equal protection of the laws is the right to travel.

The right to travel originated in English common law. Chapter 42 of the Magna Charta allowed every man to leave England except during wars.

In the United States, the Articles of Confederation provided in Article IV that the people of each state shall have free ingress and egress to and from any other state. When the Constitution was drafted, however, there was no mention of a right to travel. Since the right was not discussed during the constitutional convention, it is likely that travel was assumed to be so fundamental that it was implicit in the Constitution, rather than rejected.

Reference to a right to travel in Supreme Court decisions occurred intermittently. *U. S. v. Wheeler*, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (1920); *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Williams v. Fears*, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867); *Passenger Cases*, 48 U.S. (7 How.) 283, 491–92, 12 L.Ed. 702, 789–90 (1849). *Although there has been no dispute in the Supreme Court concerning the existence of the right to travel, controversy has loomed concern-*

ing its constitutional source. The sources that have been suggested are the privileges and immunities section of either Article IV or the Fourteenth Amendment, the due process clauses of the Fifth and Fourteenth Amendments, the commerce clause, the Ninth Amendment and a general unwritten premise of the Constitution.

The Supreme Court has delineated the nature of the modern travel doctrine in a series of cases beginning in 1941 with *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). In *Edwards*, a majority of five justices held a California law prohibiting assistance for non-resident indigents entering the state to be an unconstitutional burden on interstate commerce.

The significance of *Edwards* is that the Court affirmed in very positive terms the existence of a constitutional right to travel. *Edwards*, however, is usually interpreted as guaranteeing this right for interstate, but not for intrastate travel because of the Court's reliance on the interstate commerce clause.

The right to travel took on additional dimensions approximately twenty years later in the passport cases, *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). These cases were concerned with the freedom to leave the United States for foreign travel and the authority of the Secretary of State to withhold passports from applicants associated with communist organizations.

In *Kent*, the Court based its decision on other grounds than the right to travel, holding that the Secretary of State had exceeded his authority under a statute regulating the issuance of passports by attempting to withhold them. The Court in *dictum*, however, strongly recognized a right to travel derived from the due process clause of the Fifth Amendment. The Court stated:

> "Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage."

The Court in *Aptheker* used strong language similar to *Kent*, but unlike *Kent*,

based its decision squarely on the right to travel. Travel was referred to as a basic freedom, and a statute denying a passport to a communist was declared unconstitutional on its face.

The holding of *Aptheker* could be limited to cases where travel was abridged because of a person's affiliation. The construction would result in holding that restrictions placed on travel should only be narrowly construed when they infringed on a first amendment right. In all other cases restrictions would be allowed if reasonable. Alternatively, *Aptheker* could be broadly interpreted to hold that travel itself was comparable to first amendment rights and therefore entitled to a high degree of protection independent of any relationship to a particular first amendment freedom.

One of the consequences of relating travel to the First Amendment is that a restriction on travel may be challenged on its face. Generally, to have standing to challenge the constitutionality of a statute, one must show personal injury from the statute as applied. When First Amendment rights are involved, however, the statute may be challenged on its face without alleging an unlawful application. This prevents statutes from having a chilling or deterrent effect on the exercise of First Amendment rights.

The right to travel received an additional bulwark in *U. S. v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1965), which was concerned with the murder of a Negro traveling through Georgia.

The prior travel cases had prevented State and Federal abridgement of the right of travel, and *Guest* extended this to *interference by private individuals*.

Since the Court held that the right to travel was implicit in the Constitution itself, and then enforced congressional legislation in order to protect travel, it is possible, carrying this logical progression one step further, that Congress has authority based on this constitutional right to enact legislation regulating governmental and private action relating to travel.

The Court began its analysis in *Shapiro,* supra, by affirming its holding in *Guest,* that the right to travel was based on the Constitution in general. Then, on language similar to *Aptheker,* the Court said that a statute deterring the immigration of indigents was constitutionally impermissible because of the chilling effect on travel.

The Court then invoked the *compelling state interest* to protect travel.

In moving from State to State appellees were exercising a constitutional right and any classification which serves to penalize the exercise of that right, *unless shown to be necessary to promote a compelling governmental interest,* is unconstitutional.

Thus, it appears, although the language in *Shapiro* is not completely clear, that the Court rested on two separate grounds. Residency requirements violated the right to travel as a right embodied in the Constitution itself, which the Court emphasized, and as a *fundamental right* protected by the Equal Protection Clause of the Fourteenth Amendment.

The main controversy concerning *Shapiro* has been over the application of the *compelling state interest test to travel.* This demanding standard requires the governments to prove that certain classifications they have imposed are vital to the promotion of a compelling governmental interest. Classifications subject to test are those involving "suspect" areas and fundamental rights. Suspect areas are race, religion and color; fundamental rights include marriage and procreation, voting and certain aspects of criminal procedures, First Amendment rights and, as the result of *Shapiro,* travel.

The compelling state interest test formulated in *Shapiro* does not automatically preclude most regulations of travel. Rather, it involves two questions; first, whether a regulation of travel placed a penalty on the right to travel; and if so; second, whether the regulation promoted a compelling governmental interest.

Additional interpretation of the travel doctrine as formulated in *Shapiro* was pro-

vided by the Supreme Court in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), although the facts of the case did not involve travel. The Court stated that travel invoked the compelling state interest test since it was protected by the Constitution, and that the reason for its decision in *Shapiro* was because the right to travel was violated, not because welfare legislation was involved.

Since *Shapiro,* some lower courts in majority and dissenting opinions have been referring to the travel doctrine in a variety of cases. For example, it has been used to challenge laws discouraging people from living outside a State, *In re King,* 3 Cal.3d. 266, 90 Cal.Rptr. 15, 474 P.2d 983; requiring college undergraduate to live on campus, *Pratz v. Louisiana Polytechnic Institute,* 316 F.Supp. 872, 888 (D.C.La.); returning non-resident patients of state hospitals to their home states, *Vaughan v. Bower,* 313 F.Supp. 37, 42 (D.C.Ariz.); requiring residency for medical care, *Bd. of Supervisors v. Robinson,* 105 Ariz. 280, 463 P.2d 536, 537 (1970); requiring residency for employment, *Purdy & Fitzpatrick v. State,* 71 Cal.2d 566, 456 P.2d 645, 653–55, 79 Cal. Rptr. 77; prescribing residency as a voting qualification, *Burg v. Canniffe,* 315 F.Supp. 380, 386 (D.C.Mass.1970). See 66 N.W.U.L. Rev. 635.

The majority opinion in *Shapiro* rejected the dissent's suggestion that all residence requirements were called into question by the decision. 394 U.S. at page 638 n. 21, 89 S.Ct. at page 1333, 22 L.Ed.2d at page 617, the Court stated:

"We imply no view of the validity of waiting-period or residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel."

In other words, although any durational residence requirement impinges to

some extent on the right to travel, the Court in *Shapiro* did not declare such requirements to be per se unconstitutional. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

■ The Supreme Court has clearly indicated that the right to travel is a fundamental personal right,[3] that can be impinged only if to do so is necessary to promote a compelling governmental interest. *Cole v. Housing Authority of the City of Newport,* 435 F.2d 807 (1 Cir. 1970). The compelling state interest is triggered by any classification which serves to *penalize* the exercise of that right to travel.

A penalty in this context means the suffering of disadvantage, loss or hardship due to some action. *Larsen v. Gallogly,* 361 F.Supp. 305 (D.C.R.I.1973).

In *Cole v. Housing Authority of the City of Newport,* supra, the Court of Appeals for the First Circuit at page 811, stated:

"The answer, we think, lies in the Court's concept of the right to travel. The Court apparently uses 'travel' in the sense of *migration* with intent to settle and abide. See note, *Shapiro v. Thompson: Travel, Welfare and the Constitution,* 44 N.Y.U.L.Rev. 989, 1012 (1969).

*Thus, laws that comparatively disadvantage persons traveling to take advantage of state benefits and then leaving are permissible under Shaprio.*" (emphasis added).

■ On January 14, 1975, the United States Supreme Court held in *Sosna v. State of Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532, 43 L.W. 4129 (1975), that the Iowa durational residency requirement for divorce is not unconstitutional. States statutes imposing durational residency requirements were of course invalidated when imposed by States as a qualification for welfare payments, *Shapiro v. Thompson,* supra; for voting, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); and for medical care, *Memorial Hospital v. Maricopa County,* supra. None of those cases intimated that the States might never impose durational residency requirements, and such a proposition was in fact expressly disclaimed (See Footnote 21 of *Shapiro*). What those cases had in common was that the durational residency requirements they struck down were justified on the basis of budgetary or record-keeping considerations which were held insufficient to outweigh the constitutional claims of the individuals.

If we take into consideration the grounds that have been given to establish the non-resident bond requirements and the language of the cases of *Cole*[4] and *Sosna,*[5] we are forced to conclude that this residency requirement is included within the exception established in the *Shapiro* case.

■ The concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the government action questioned or challenged. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). However, uniform treatment does not mean that a state may never distinguish between citizens, *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 474 (1968); and a mere classification, has often been said, does not of itself deprive a group of equal protection. *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct.

3. *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Passenger Cases,* 7 How. 283, 12 L.Ed. 702; *Crandall v. Nevada,* supra; *Paul v. Virginia,* 8 Wall 168, 19 L.Ed. 357; *Edwards v. California,* supra; *Kent v. Dulles,* supra; *Shapiro v. Thompson,* supra; *Dunn v. Blumstein,* supra; *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1971); *Wyman v. Lopez,* 404 U.S. 1055, 92 S.Ct. 736, 30 L.Ed.2d 743 (1972); *Memorial Hospital v. Maricopa County,* supra.

4. We think *plaintiffs* (classified as non-residents) are not traveling, if we take into consideration Judge Coffin's definition of the word "travel" in *Cole v. Housing Authority of Newport,* supra.

5. First case after the trilogy of *Shapiro, Dunn* and *Memorial Hospital,* supra, in which the Supreme Court holds the constitutionality of a law dealing with a residency requirement. This Court's residency requirement may be justified on grounds other than purely budgetary consideration or administrative convenience.

775, 13 L.Ed.2d 675 (1955); *Starns v. Malkerson,* 326 F.Supp. 234 (N.D.Minn.1970).

█ In view of the foregoing, we understand that the non-resident bond is justified either because it promotes a compelling state interest or because it is not a penalty upon the constitutional right to travel. See *Pigg v. Brockman,* 79 Idaho 233, 314 P.2d 609 (1957); *Ex Parte Louisville,* 124 Ala. 547, 27 So. 239; *Keown v. Hughes,* 233 Mass. 1, 123 N.E. 98. Other cases upholding reasonable requirements for an advance of, or security for, costs, fees or other expenses, as a condition to exercise the right to litigate in courts are: *Pyramid Land & Stock Co. v. Pierce,* 30 Nev. 237, 95 P. 210; *Missouri K. & T. R. Co. of Texas v. Harris,* 234 U.S. 412, 34 S.Ct. 790, 58 L.Ed. 1377; *Meeker v. Lehigh Valley R. Co.,* 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644.

## II. PRIVILEGES AND IMMUNITIES

█ Article IV, Section 2, Clause 1 of the Constitution of the United States provides in part:

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

The clause thus establishes a norm of comity without specifying the particular subjects as to which citizens of one state coming within the jurisdiction of another are guaranteed equality of treatment. *Austin v. State of New Hampshire,* 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530, 43 L.W. 4400 (1975). During the pre-constitutional period, the practice of some states denying to outlanders the treatment that its citizens demanded for themselves was widespread. The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse in one Nation a collection of independent, sovereign states. Like many other constitutional provisions, the privileges and immunities clause *is not absolute.* It does bar discrimination against citizens of other states where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other states. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

In *Toomer v. Witsell,* supra, at pages 398–399, 68 S.Ct. at pages 1163–64, 92 L.Ed. at pages 1472–73, the Court stated that the state may restrict the type of equipment used in fisheries, to graduate license fees according to the size of the boats, or even to charge non-residents a differential which would merely compensate the state for any added enforcement burden they may impose.

█ It is settled that absolute equality is not a requisite under the Privileges and Immunities Clause. We understand that the same reasons we gave to sustain that Rule 6 does not violate the Equal Protection Clause of the Constitution, serve as valid reasons to decide that this Court's rule is not an invidious discrimination in violation of the Privileges and Immunities Clause. See *Brewster v. North American Van Lines,* supra.

In view of the foregoing, it is hereby decided that Rule 6 of this Court is constitutional. Nevertheless, as expressed in the present local Rule 5 of this Court, this Rule shall be liberally interpreted in favor of the plaintiff so as not to preclude his right to sue through excessive bond requirements. Consistent with this, the Court, for good cause shown, may dispense with this requirement.

Plaintiff is hereby ordered to post a bond in the amount of $500.00 without prejudice to the plaintiff to show that this amount is excessive.

IT IS SO ORDERED.