[No. B136807. Second Dist., Div. Seven. July 30, 2001.]

GAGIK BALTAYAN, Plaintiff and Appellant, v.
ESTATE OF MARO GETEMYAN et al., Defendants and Respondents.

1428

## COUNSEL

Law Office of Philip E. Carey and Philip E. Carey for Plaintiff and Appellant.

Law Offices of Ira Cohen and Ira Cohen for Defendants and Respondents.

## OPINION

**BOLAND, J.\*—**

### INTRODUCTION

Appellant Gagik Baltayan's personal injury action was dismissed after he failed to comply with the trial court's order requiring him to post an

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

undertaking pursuant to Code of Civil Procedure section 1030. Appellant argues that the undertaking should not have been required because respondent did not make a sufficient showing that it had a reasonable possibility of obtaining a defense verdict. He also argues that the trial court abused its discretion and violated appellant's equal protection and substantive due process rights by failing to waive the undertaking after appellant showed that he was indigent.

We hold that the evidence presented by the parties at arbitration and an arbitration award in favor of respondent established a reasonable possibility that respondent would prevail at trial. Because appellant's showing of indigency was weak, incomplete, and inconsistent with some of his admitted spending, the trial court did not abuse its discretion in denying appellant's motion for relief from the security order. Nonetheless, after appellant effectively proved his indigency and was granted in forma pauperis status, the trial court abused its discretion in dismissing the case due to appellant's failure to post the undertaking.

BACKGROUND AND PROCEDURAL HISTORY

Respondent Maro Getemyan, while driving a car owned by Hagop Etmekjian, struck the car of appellant Baltayan. Appellant filed a complaint alleging that Etmekjian negligently entrusted the car to Getemyan, whose negligent driving caused the accident. Getemyan died from causes unrelated to the accident. In accordance with the provisions of Probate Code section 552, her estate was substituted as a defendant.

After the case was ordered to judicial arbitration and an arbitration date had been scheduled, appellant requested leave to amend his complaint to add a product liability claim against General Motors. Appellant ultimately withdrew the motion, and respondents filed a motion under Code of Civil Procedure section 1030 to require appellant, a resident of the State of Washington, to post a bond. Code of Civil Procedure section 1030 provides that upon a defendant's motion, the trial court is required to order an out-of-state plaintiff to file an undertaking to secure recoverable costs and attorney's fees if the defendant shows a reasonable possibility that it will obtain judgment in the action.

Respondents based their motion for a bond on statements contained in the police report and attributed to Getemyan, Baltayan, and Baltayan's passenger, Arsen Ouloubian. In that report, Los Angeles Police Department Officer Steven Fisher quoted appellant as telling him "I was driving east on Hollywood Boulevard. I was with my friend. I pulled over to the curb, but I saw

a no parking sign. I put on my blinker and pulled out and suddenly I was hit." Fisher wrote that Ouloubian's statement was "substantially the same as" appellant's, and that Getemyan told Fisher that she was driving east on Hollywood Boulevard when she saw appellant's car moving slowly along the curb. As "she started to pass," appellant's car pulled out.

Appellant subsequently wrote his own supplement to the police report in which he stated that he was driving in the rightmost lane and planned to turn right at the next intersection. While he was stopped waiting for a truck that pulled out from a driveway in front of him, he saw Getemyan approaching quickly from behind. She disappeared from view, then hit his car from behind. After the accident, appellant approached Getemyan, who said, "I nearly killed you."

The court continued the bond motion until after arbitration.

At the arbitration, appellant testified and the parties submitted various documents for consideration. The next day, the arbitrator issued his ruling awarding appellant nothing and awarding respondents costs. In a letter accompanying the award, the arbitrator stated that:

"Based upon statements made to the investigating police officer on the date of the accident by the plaintiff, the decedent defendant and plaintiff's passenger, it appears that the accident was caused by plaintiff's unsafe turning maneuver into the path of the decedent's vehicle.

"I disregarded the plaintiff's arbitration testimony as self-serving and lacking in credibility. The evidence suggested that the plaintiff had a reasonably good command of the English language at the time he was interviewed by the police officer and that he changed his version of the accident only after he had seen an attorney. Finally, I found plaintiff's argument that photographs of his vehicle supported his version to be unpersuasive."

Appellant filed a timely request for a trial de novo. Respondents renewed their motion to require appellant to post a bond and cited the arbitration award as additional evidence that it was reasonably possible that respondents would prevail. Appellant did not oppose the motion on its merits, but simply argued that the court had agreed to hear it at the trial setting and status conference scheduled about three weeks after the noticed hearing date. Neither appellant nor his attorney appeared at the hearing on the motion, which the trial court granted. The court gave appellant ten days to post an undertaking in the amount of $22,000.

Before the 10 days expired, appellant filed a motion for relief from the order on the grounds that he was indigent, requiring him to post the security

would violate his right to equal protection, respondent had not shown a reasonable possibility that it would obtain a judgment at trial, and the court has abused its discretion in giving appellant only 10 days to post the bond. The court gave appellant an additional 15 days to post the security, but otherwise denied his motion. About three months later, appellant obtained an order waiving court fees and costs.

Appellant did not post the undertaking, and respondents moved to dismiss the action. Appellant opposed on the ground that he was now in forma pauperis, and the court should waive the undertaking. The court granted the motion to dismiss, and this appeal followed.

## DISCUSSION

### 1. *Respondents demonstrated a reasonable possibility that they would obtain a judgment in their favor.*

■ Appellant contends that respondents did not meet their burden of showing a reasonable possibility that they would obtain a defense verdict, as opposed to simply reducing appellant's recovery through comparative fault. He argues that he was rear-ended by Getemyan, and the statement attributed to him in the police report should be disregarded because his English language skills were poor.

Respondents were not required to show that there was no possibility that appellant could win at trial, but only that it was *reasonably possible* that respondents would win. (Code Civ. Proc., § 1030, subd. (b).) They satisfied this burden by directing the court to the arbitration award, the arbitrator's letter, and the police report. (*Shannon v. Sims Service Center, Inc.* (1985) 164 Cal.App.3d 907, 914 [210 Cal.Rptr. 861] [reasonable possibility shown by arbitration decision in favor of defendant].) At the arbitration hearing, appellant testified and presented the same arguments and documentary evidence urged in support of his motion for relief from the order requiring an undertaking. The arbitrator nonetheless found appellant's initial statement to police to be more credible and consistent with Getemyan's and Ouloubian's statements to police. Officer Fisher testified in his deposition that he was able to speak to appellant without an interpreter, they had a conversation about Spokane, and appellant's answers to Fisher's questions were responsive and led him to believe that appellant understood him. Appellant provided corroboration of Fisher's assessment of his language skills by attaching to his arbitration brief a hospital report that stated that appellant "speaks reasonable English."

Moreover, the reports by the parties' respective accident reconstruction experts were largely consistent with one another, and neither report concluded that the physical evidence contradicted the description of the accident

given by the parties to Officer Fisher. Appellant's expert stated that the damage to the cars showed that it was an offset collision with the cars driving at different angles at the time of the collision. In his opinion, the damage to the cars indicated that Getemyan's car was going 25.9 to 37.5 miles per hour at the time of impact. Appellant's expert believed the damage, as well as the locations where the cars came to rest, was more consistent with "a pre-impact swerve" by Getemyan. Respondents' expert agreed that it was an offset collision and that the angle of impact could not be determined. However, given the size of appellant's car and the point of impact identified by Officer Fisher, respondents' expert believed that appellant's car was not adjacent to the curb, but had pulled away from the curb by 4.3 feet. The extent of the damage to each car indicated a "relative impact speed" of 20 to 24 miles per hour. Respondent's expert opined that the physical evidence supported the parties' statements in the police report.

Appellant argued that the arbitrator could not have evaluated the "voluminous" evidence submitted because he issued his decision the very next day. However, having read the parties' arbitration briefs and the documents attached thereto, this court found that the review consumed little time. Many of appellants' documents pertained to damages, and were thus irrelevant to determining liability. In addition, the copy of appellant's brief included in Appellant's appendix contains two copies of lengthy medical records, including numerous pages of heart monitor graphics. The arbitrator could easily have reviewed the parties' documents in the evening hours following the hearing or the next day before issuing the award.

Appellant's claim herein essentially challenges the sufficiency of the evidence. This court's task is simply to determine whether any substantial evidence supports the trial court's determination. (*Shannon v. Sims Service Center, Inc.*, *supra*, 164 Cal.App.3d at p. 911.) Given the fact of the arbitration award, as well as the evidence submitted in support of each side's position, the trial court properly found that there was a reasonable possibility that respondents would win at trial.

2. *The trial court abused its discretion in dismissing the case after appellant was granted in forma pauperis status.*

Appellant contends that his showing of indigence required the trial court to waive the bond requirement.

Where the plaintiff establishes indigency, a trial court has discretion to waive the posting of security under Code of Civil Procedure section 1030. (*Bank of America v. Superior Court* (1967) 255 Cal.App.2d 575, 578 [63

Cal.Rptr. 366].) However, the plaintiff should make a prima facie showing that he has unsuccessfully attempted to obtain the required undertaking or that he is unable to furnish it. (*Fuller v. State of California* (1969) 1 Cal.App.3d 664, 668 [82 Cal.Rptr. 78].)

Appellant accompanied his motion for relief with his declaration stating that he had no savings and neither he nor his wife owned real property. His declaration also said that his family's income for 1999 was the same as that reflected on the attached copies of their 1997 and 1998 federal income tax returns. The attached tax return copies were incomplete because they indicated business income requiring completion of schedule C, but did not include a copy of that schedule. The returns reflected adjusted gross income of $15,150 in 1997 and $14,248 in 1998.

Based on appellant's declaration and tax returns, the trial court could have exercised its discretion by waiving the security requirement or reducing the amount of the undertaking. This does not mean, however, that the trial court abused its discretion by declining to do so. ■ An exercise of discretion will be disturbed on appeal only if the court exercised it in an arbitrary, capricious, or patently absurd manner resulting in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

■ Here, it cannot be said that the trial court's decision was arbitrary, capricious or patently absurd. Appellant relied primarily upon the copies of his tax returns to show low income, but apparently deliberately omitted from each return schedule C. The schedule would have revealed the actual business gross receipts of the business and the amount claimed as deductible business expenses. In addition, appellant's declaration did not address whether his wife had any savings, nor did it deny ownership of assets other than real property, e.g., jewelry, artwork, equipment or cars that might be used as collateral to secure the bond. Appellant likewise did not address whether he or his wife had a friend or relative who would be willing to either post a cash bond or pay the premium on a surety bond. (*Fuller v. State of California, supra*, 1 Cal.App.3d at p. 667.) Nor did appellant or his attorney show that they had made any unsuccessful effort to obtain an undertaking. Counsel's declaration merely stated that he had "inquired of several bond companies as to the procedure for obtaining" the required undertaking, but did not show any actual attempt to obtain it.

Moreover, appellant's arbitration brief, which he attached to his motion for relief, showed a spending level that reasonably cast doubt upon

appellant's indigency claim. He claimed as damages attributable to the accident $1,260 for a motel in Hollywood and $1,818 for a rental car in Los Angeles. Thus, appellant apparently had sufficient resources to maintain a temporary residence in Los Angeles, instead of returning home to Spokane. Respondents also claimed in their opposition to the motion for relief that appellant had paid for round-trip airfare to Moscow. While respondents did not authenticate purported copies of an aircraft boarding pass and train tickets attached to their opposition, appellant waived this defect by failing to object. (Evid. Code, § 353, subd. (a).) As far as the record shows, appellant never denied that he paid for the trip.

Thus, given appellant's weak and incomplete showing of indigency, the trial court did not act arbitrarily, capriciously or absurdly in denying appellant's motion for relief from the undertaking.

■ Appellant also argues that, instead of granting respondents' motion for dismissal, the trial court should have vacated its order requiring an undertaking because he had been granted in forma pauperis status. Appellant first brought this new fact to the Judge Kurt J. Lewin's attention in his opposition to the motion to dismiss, which was filed on October 8, 1999. As far as the record shows, appellant failed to show diligence or explain the delay. He had first raised his indigence claim in his motion for relief on May 11, 1999, and the court did not hear that motion until June 7, 1999. Appellant could have sought in forma pauperis status at or near the time he filed his motion for relief or immediately after the denial of his motion for relief. Instead, he waited nearly three months. Even after he obtained the order waiving filing fees on September 1, 1999, he failed to bring it to Judge Lewin's attention for another five weeks. Thus, appellant let nearly six months pass before he raised the most persuasive argument he could muster in support of his quest for relief from the requirement of an undertaking.

It is thus easy to understand why the trial court would disregard appellant's belated showing. Nonetheless, given the finding of indigency necessarily underlying the in forma pauperis order, the trial court acted arbitrarily and capriciously in refusing to either vacate or reduce the amount of the undertaking.

In addition, dismissal of appellant's case resulted in a manifest miscarriage of justice. It effectively precluded appellant from litigating his claims simply because he is indigent and respondents proved a reasonable possibility of success. Despite the apparent existence of serious flaws in appellant's

case and the arbitration decision in respondents' favor, appellant may nonetheless obtain a verdict in his favor at trial. To first require him to do the impossible, i.e., post a $22,000 undertaking, would be an unconscionable burden on his attempt to seek redress for his injuries and property damage.

Given our ruling, we need not consider appellant's constitutional claims.

DISPOSITION

The judgment is reversed and remanded. Each party is to bear its own costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring.—I agree with the result of the majority in finding the trial court abused its discretion in dismissing appellant's case. But I support a broader rationale for that result and write separately to explain why, in my view, the trial court lacks discretion to impose a Code of Civil Procedure section 1030 security deposit requirement on appellant, once the judge determines appellant is financially qualified for that in forma pauperis status and possesses a nonfrivolous claim. At that point, appellant has a *right* to proceed without posting a security deposit or paying fees, and the trial court lacks discretion to deny him that right. Furthermore, a trial court cannot impose the special Code of Civil Procedure section 1030 security deposit requirement on an *indigent* out-of-state plaintiff without running afoul of the equal protection clauses of the United States and California Constitutions.

1. *Indigent litigants have the same in forma pauperis rights in California courts as they had in English courts in 1850.*

Nearly 85 years ago, in *Martin v. Superior Court*,[1] the California Supreme Court proclaimed poverty could not be allowed to deny anyone access to this state's courts. "[I]mperfect as was the ancient common-law system [in England], harsh as it was in many of its methods and measures, it would strike one with surprise to be credibly informed that the common-law courts . . . shut their doors upon . . . poor suitors . . . . Even greater would be the reproach to the system of jurisprudence of the state of California if it could be truly declared that in this twentieth century . . . it had said the same thing."[2]

Ensuring California's 20th-century system of jurisprudence could not be guilty of such a reproach, despite the absence of a state in forma pauperis

[1]*Martin v. Superior Court* (1917) 176 Cal. 289 [168 P. 135].
[2]*Martin v. Superior Court, supra,* 176 Cal. at page 294.

statute, the Supreme Court held indigent civil litigants in this state inherited the in forma pauperis rights Englishmen had enjoyed since at least 1495.[3] The court found California law adopted "the whole body of [English] jurisprudence as it stood, influenced by statute, at the time when [Political Code section 4468, the predecessor of Civil Code section 22][4] was adopted [in 1850]. And more than that, that it embraced also . . . the great hand-maiden and coadjutor of the common law, equity."[5] Thus, "the common law of England, so far as it is not repugnant to nor inconsistent with our constitution and laws, [is] the rule of decision in all the courts of this state."[6]

In defining the in forma pauperis rights English indigents possessed in 1850—and hence California indigents possess now—the California Supreme Court quoted from leading English legal scholars. First, in Blackstone's Commentaries the *Martin* court found the statutory authority for such rights

---

[3]At the time California became a state, the in forma pauperis rights indigent English litigants enjoyed were defined in what is known as the Statute of Henry VII enacted in 1495. (Statute of Henry VII (1495) 11 Hen. 7, ch. 7, 2 Statutes of the Realm 578 (transcribed in 2 Stat. 85), reprinted in Pollock (1975) Legal Aid—The First 25 Years 10. This *Statute of Henry VII* remained in force and was the source of English in forma pauperis rights until repealed and replaced by a broader provision in 1883 (see 46 & 47 Vict. ch. 49). (Maguire, *Poverty and Civil Litigation* (1923) 36 Harv. L.Rev. 361.)

While many of these rights existed in judge-made common law and in ordinances enacted before 1495, the Statute of Henry VII codified them in a single parliamentary law. That law in the English of the time read as follows: " 'Be it ordeyned and enacted by youre Highnes and by the Lordes spirituall and temporall and the Comens in this present parliament assembled and by auctorite of the same, that every pouer persone or persones which have & hereafter shall have cause of accion or accions ayenst any persone or persones within the realme *shall have*, by the discrecion of the Chaunceller of this realme, for the tyme being writte or writtes originall and writtes of Sub pena according to the nature of their causes, therfor nothing paieng to youre Highnes for the seales of the same, nor to any persone for the making *of the same writte & writtes* to be hereafter sued. And that the seid Chaunceller for the same tyme being *shall assigne* suche of the Clerkis whiche shall doo and use the making and writing of the same writtes to write the same redy to be sealed, and also lerned Councell and attorneyes for the same, without any rewarde taking therfor; And after the said writte or writtes be retorned, if it be afore the King in his Benche, the Justices ther shall assign to the same pouer persone or persones Councell lerned by their discrecions which shall geve their Councelles nothing taking for the same, and in like wise the same Justices shall appoynte attorney and attorneies for the same pouer persone and persones and all other officers requisite and necessarie to be hadde for the spede of the seid duties without any rewards for their Councelles help and besynes in the same; and the same lawe and ordre shalbe observed and kepte of all such suytes to be made afore the Kingis Justices of his comen place and Barons of his Eschequer and all other Justices in Courtes of Recorde where any suche suetis shall be.' " (2 Statutes of the Realm 578, as quoted in full in Maguire, *Poverty and Civil Litigation, supra,* 36 Harv. L.Rev. 361, 373, italics added.)

[4]"The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all courts of this State." (Civ. Code, § 22.2.)

[5]*Martin v. Superior Court, supra,* 176 Cal. at page 293.

[6]*Martin v. Superior Court, supra,* 176 Cal. at page 292.

—the Statute of Henry VII mentioned above, excusing them from pretrial fees and costs, along with a Statute of Henry VIII excusing them from paying their opponent's costs should they lose. " 'And paupers . . . are, by statute (Stats. 11 Hen. VII, c. 12), to have original writs and *subpoenas gratis*, and counsel and attorney assigned them without fee; and are excused from paying costs, when plaintiffs, by the statute (Stats. 23 Hen. VIII. c. 15).' "[7]

While holding California law absorbed English statutory law, e.g., the Statutes of Henry VII and Henry VIII, the Supreme Court also emphasized the Statute of Henry VII itself was a codification of an existing common law right. "Thus says Marshall in his 'Law of Costs in all Suits and Proceedings in the Courts of Common Law' (page 347): 'With a view to enable such poor persons as have not ability to pay the expenses incidental to the prosecution of an action to enforce their rights, they may, upon such inability being shown, be admitted to sue *in forma pauperis*. When so admitted the plaintiff is exempt from the payment of court fees, and he is entitled to the service of counsel, and of an attorney, who render their services without reward. This privilege, so far as regards the exemption from court fees, was conceded at common law; for where the plaintiff swore that he was unable to pay for entering his pleadings, the officer was bound to enter them *gratis*.' "[8]

Having found England had in both its judge-made and statutory law provided indigent litigants with the *right* to proceed without payment of fees or costs, the Supreme Court did not bother to mention whether "the great handmaiden and coadjutor of the common law, equity" likewise granted in forma pauperis rights to poor people appearing in those courts. In a forum dedicated to doing equity, however, it should surprise no one to find the English courts of equity indeed allowed poor people to litigate in forma pauperis. In the 1845 opinion of *Oldfield v. Cobbett* the Lord Chamberlain explained the long-standing practice in equity. "The right to sue in *forma*

---

[7]*Martin v. Superior Court, supra,* 176 Cal. at page 294. The language the Supreme Court quoted is from Blackstone, Commentaries on the Laws of England.

[8]*Martin v. Superior Court, supra,* 176 Cal. at pages 294-295. Six years after the California Supreme Court filed its opinion in *Martin v. Superior Court,* Professor Maguire of Harvard published an article further documenting the rights of indigent civil litigants in medieval England. He was able to trace those rights back another almost four hundred years before 1495, to the reign of Henry I [1100-1135], where indigents were excused from posting security and instead " 'that those who had not sufficient present security should pledge their faith to make satisfaction to the utmost of their power.' " (Maguire, *Poverty and Civil Litigation, supra,* 36 Harv. L.Rev. at p. 361, quoting from Mirror of Justices (1893) 7 Seld. Society 14). Professor Maguire also reports that in the reign of Edward I, a poor litigant could " 'sue his plaint upon the pledge of his promise only; and then he shall find no other security to the sheriff.' " (Maguire, at p. 362, quoting from Britton, (Nichols's trans. 1901) p. 243.)

*pauperis* originated in the statute of Hen. 7. This and the subsequent statute of Hen. 8 are confined to actions in the Courts of Common Law, and do not extend to Defendants. The Courts of Equity have adopted the principle of these statutes, and, proceeding further, have extended the relief to the case of the Defendants."[9] A later treatise described the in forma pauperis rights poor people enjoyed in the equity courts during the reign of Elizabeth I as "an arrangement whereby the court assigned to poor suitors their counsel and attorneys free of charge and allowed them their process without charge."[10]

Thus, at the time California became a state, English statutory law, judge-made law, and equity all gave indigent litigants a *right* to access the courts by waiving the required fees and costs. As a result, the Supreme Court ruled, California courts were bound to do the same. (From at least 1495 and onward the English common law likewise gave indigent litigants a right to appointment of free counsel to represent them, as well. But that issue was not before the *Martin* court, nor is it raised in this case.)[11]

The *Martin* court then dealt with the question whether these common law in forma pauperis rights were repugnant to or inconsistent with the California statutes which appeared to insist on the collection of fees and costs from *all* litigants. The Supreme Court first reserved the issue whether the legislature even had the power to abrogate this fundamental right of access to the courts.[12] It then held, "it is obvious that only the plainest declaration of legislative intent would be construed as even an *effort* to do this thing. We

---

[9]*Oldfield v. Cobbett* (1845) 41 Eng.Rep. 765, 766, italics omitted.

[10]Jones, The Elizabethan Court of Chancery (1967) page 501.

[11]See the language quoted from *Martin v. Superior Court, supra*, 176 Cal. 289 at page 1436, *ante*, describing the in forma pauperis rights the English common law granted to indigent English litigants. As will be noted, the rights described included the right to appointment of free counsel. The *Martin* court, in turn, is quoting from two leading treatises on English law, Blackstone's Commentaries and Marshall's Law of Costs in all Suits and Proceedings in the Courts of Common Law. The full text of the Statute of Henry VII quoted in footnote 3, *ante*, also instructs judges they *shall* appoint "Councell lerned by their discrecions which shall geve their Councelles nothing taking for the same, and in like wise the same Justices shall appoynte attorney and attorneies for the same pouer persone and persones and all other officers requisite and necessarie to be hadde for the spede of the seid duties without any rewards for their Councelles help and besynes in the same, . . ." Likewise, the description of in forma pauperis rights in English equity courts found, *ante*, at page 1438, includes a provision for the assignment "of counsel and attorneys free of charge." See also Knox, *Current Prospects for an Indigent's Right to Appointed Counsel and a Free Transcript in Civil Litigation* (1976) 7 Pacific L.J. 149 for a discussion of the full scope of in forma pauperis rights under the English common law and their relevance for California's indigent civil litigants.

[12]The Supreme Court prefaced its discussion of whether the Legislature in fact had abrogated the courts' inherent power to grant indigent litigants their right to access the courts without paying fees, with the comment, "Quite aside from the question as to the *power* of the legislature to do this thing, . . ." (*Martin v. Superior Court, supra*, 176 Cal. at p. 297, italics added.)

find no such expressed intent. . . . Neither individually nor collectively are they even susceptible of the construction that the design of the legislature was to deny to the courts the exercise of their *most just and most necessary inherent power*."[13] Among the then existing statutes deemed not susceptible to such a construction was one which expressly extended in forma pauperis rights in justice courts (while not creating such rights in higher trial courts),[14] another requiring posting of jury fees to avoid waiver of the right to jury trial,[15] and yet another forbidding state and local officers from performing any function requiring fees unless those fees had been prepaid.[16] The Supreme Court considered all of these and like statutes to be subject to an unwritten but controlling proviso: all of these potential barriers were to be waived for indigent litigants who otherwise would be denied access to the courts.

2.  *In forma pauperis rights in California include the right to waiver of any duty to post security guaranteeing an opposing party's costs.*

Cases decided after *Martin v. Superior Court, supra,* 176 Cal. 289, have held the inherent common law in forma pauperis rights of indigent California litigants also include elimination of the sort of barrier present in the case before this court—the requirement litigants post security to protect the economic interests of the opposing party. In the first of these decisions, *County of Sutter v. Superior Court,*[17] the Court of Appeal followed the reasoning of *Martin v. Superior Court* in addressing that issue. "California's adoption of the 'common law' embraced common law jurisprudence in general, including its existent statutory modifications. . . . In the reign of Henry I (1100-1135) an ordinance requiring security was mitigated for the poor by a provision ' "that those who had not sufficient present security should pledge their faith to make satisfaction to the utmost of their power." ' . . . The authorities justify the conclusion that the common-law power embraced waiver of security for costs as well as suspension of fees."[18] Since indigent Englishmen were entitled to waiver of security in 1850, the *Sutter* court ruled indigent Californians are, too.

The Supreme Court later endorsed the rationale of *County of Sutter* in upholding the waiver of security requirements. In *Conover v. Hall*[19] our high court approved waiver of an injunction bond ordinarily required by Code of

[13]*Martin v. Superior Court, supra,* 176 Cal. at page 297, italics added.
[14]*Martin v. Superior Court, supra,* 176 Cal. at page 296.
[15]*Martin v. Superior Court, supra,* 176 Cal. at page 291.
[16]*Martin v. Superior Court, supra,* 176 Cal. at page 291.
[17]*County of Sutter v. Superior Court* (1966) 244 Cal.App.2d 770 [53 Cal.Rptr. 424].
[18]*County of Sutter v. Superior Court, supra,* 244 Cal.App.2d 770, 774.
[19]*Conover v. Hall* (1974) 11 Cal.3d 842 [114 Cal.Rptr. 642, 523 P.2d 682].

Civil Procedure section 529 based on the trial court's conclusion the plaintiff was indigent. The Supreme Court did so even though the plaintiff did not file an in forma pauperis petition and the trial court failed to hold a hearing to determine his financial status. It was enough the record reflected the plaintiff was too poor to post the bond.[20]

Then a year later in *Beaudreau v. Superior Court*[21] the Supreme Court held it would represent an unconstitutional denial of due process to impose the security requirements provided in Government Code former sections 947 and 951 without allowing plaintiffs a hearing. At this guaranteed hearing, in turn, the court is to consider whether plaintiffs are entitled to a lower security bond or deposit because of the merits of their claim or their modest means, or outright waiver because of their status as indigents.[22] The lynchpin of this opinion is its holding a security bond requirement qualifies as a taking of property whether plaintiffs are forced to post a bond or instead must dismiss their claims because they cannot afford that bond. In one instance the property is the cost of the bond (or lost use of a cash deposit) and in the other the loss of a legal claim, which the court also found qualifies as a property interest.[23]

[20]*Conover v. Hall, supra,* 11 Cal.3d 842, 850-853.

[21]*Beaudreau v. Superior Court* (1975) 14 Cal.3d 448 [121 Cal.Rptr. 585, 535 P.2d 713].

[22]"It is convenient to note at this point that under applicable decisional law the plaintiff, upon motion for relief from an undertaking requirement, is entitled to a hearing so that it may be determined whether or not the plaintiff qualifies to proceed in forma pauperis." (*Beaudreau v. Superior Court, supra,* 14 Cal.3d at p. 454.)

"The statutes now before us make no provision for a hearing on the question of the merit of the plaintiff's action or on the reciprocal questions of the necessity of an undertaking for the defendant's protection and the reasonableness of its amount. . . . [¶] . . . [¶] . . . [O]ur conclusion that the operation of sections 947 and 951 results in a 'taking' of property within the meaning of established due process principles is in harmony with all of the recent decisions of this court. We have repeatedly recognized that statutes providing a procedure according to which one litigant can be forced to relinquish an interest in his property for the benefit of another effectuate a 'taking' of property, entitling the former to prior procedural safeguards. Accordingly we have held accountable to the principles of procedural due process California statutes dealing with wage garnishment." (*Beaudreau v. Superior Court, supra,* 14 Cal.3d at pp. 454-457.)

[23]"Subjecting the statutes now before us to the spotlight of the foregoing rationale, we are convinced that they involve a two-fold taking of property. To put it another way, a plaintiff is deprived of his property whether he complies with the statute and files the demanded undertaking or refuses to comply and incurs dismissal of his action. If he takes the former course and secures his undertaking from a corporate surety . . . he will at least be deprived of his nonrefundable premium; if he deposits money in court in lieu of an undertaking, he will be deprived of its use during the pendency of the action. [¶] If the plaintiff takes the latter course and incurs dismissal of his action, he will also have suffered a 'taking' of his property, since his claim against a public entity or public employee—assuming that it is bona fide and potentially meritorious—is a 'property interest' within the meaning of the due process clause." (*Beaudreau v. Superior Court, supra,* 14 Cal.3d at p. 456, fn. omitted.)

The very security requirement at issue in this case, the one required by Code of Civil Procedure section 1030, also has come before the California courts. In *Bank of America v. Superior Court*,[24] an appellate court held indigent out-of-state plaintiffs enjoy in forma pauperis rights to waiver of the security provided in 1030. After discussing *Martin v. Superior Court* and *Sutter*, the court explained why the rationale of these opinions controlled a security requirement imposed on out-of-state plaintiffs as well. "We believe parallel reasoning applies to Code of Civil Procedure section 1030. The only discernible distinction in the relative positions of a plaintiff within the purview of Government Code section 947 and a plaintiff under Code of Civil Procedure section 1030 is nonresidency. But this distinction is verbal; there is none in substance. A local plaintiff who is indigent differs not at all from a nonresident plaintiff who cannot pay costs. In either instance the likelihood of a prevailing defendant collecting his costs is nil, because the plaintiff in each circumstance is a pauper. [¶] Since in its fundamental aspects our case is apposite to the *Sutter* case, we deem the reasoning of *Sutter* to be controlling."[25]

The Supreme Court cited *Bank of America v. Superior Court* with approval in its *Conover v. Hall* opinion.[26] Thus, it has been settled for over a quarter century—indigent out-of-state plaintiffs, such as the appellant in the instant case, are *entitled* to waiver of the Code of Civil Procedure section 1030 security bond or deposit if they are indigent, even if this deprives the in-state defendants of a guarantee their costs will be covered should they prevail.

In ruling indigents are entitled to waiver of security for costs, both England and California are saying one party's economic interest in receiving its costs of litigation should it win cannot be used to deny an indigent party his fundamental right of access to the courts.[27] In other words, access trumps comfort.

Once it is established a litigant is financially eligible for in forma pauperis relief and has a colorable claim on the merits, he or she has a right to waiver of any security for costs the law may ordinarily impose as the price of admission to the courts. Otherwise California, as it enters the 21st century,

---

[24]*Bank of America v. Superior Court* (1967) 255 Cal.App.2d 575 [63 Cal.Rptr. 366].

[25]*Bank of America v. Superior Court, supra*, 255 Cal.App.2d at page 578.

[26]*Conover v. Hall, supra*, 11 Cal.3d 842.

[27]"If the statute is used as a cannon to blast the claim of a meritorious but needy plaintiff, that discretion is misused. The public defendant or its insurance carrier would be utilizing the plaintiff's poverty to shield itself from potential liability. The *in forma pauperis* power interposes judicial discretion where administrative discretion may have been misused. Judicial discretion to deny security for costs does no more than relegate [this class of defendants] to the financial risks borne by defendants generally." (*County of Sutter v. Superior Court, supra*, 244 Cal.App.2d at pp. 775-776.)

would earn that "reproach" the California Supreme Court found would be so unthinkable in the early years of the 20th century—our courts would "close their doors upon poor suitors."

Accordingly, in my view, the trial court's insistence this indigent plaintiff post a security bond was not just an abuse of the court's discretion but the denial of appellant's *right* to waiver of this security requirement. The trial court lacked discretion to deny this indigent litigant access to the courts of this state. Obviously the court had the power and the duty to determine whether a litigant, including appellant, is indigent and possesses a colorable claim, and thus is qualified for in forma pauperis relief. In that sense, it is a discretionary decision. But here that issue had been laid to rest by the time of the hearing on the motion to dismiss. Appellant had been granted in forma pauperis status. He thus had acquired in forma pauperis rights, which included the *right* to waiver of a security bond or deposit. At that point, the trial court lacked discretion to require such a deposit or bond and, a fortiori, lacked the power to dismiss appellant's action for his failure to post such deposit or bond.

3. *California does not and constitutionally cannot deny out-of-state indigent plaintiffs access to its courts by requiring security of them that it does not require of in-state indigent plaintiffs.*

May California courts "shut their doors" upon indigent out-of-state litigants—while leaving them open to our own poor citizens—without earning that same "reproach" the Supreme Court feared 85 years ago? I think not. Nothing in *Martin v. Superior Court* suggests this state's in forma pauperis rights are reserved solely for our own citizens and residents and, as discussed above, *Bank of America v. Superior Court*, holds they are not,[28] a view the Supreme Court endorsed in *Conover v. Hall*.[29]

Moreover, I question whether such discrimination would pass constitutional muster under the equal protection clause—either applying a strict scrutiny or a rational basis test. Since I regard the dismissal of appellant's action to be improper under settled principles of California in forma pauperis law I find it unnecessary to present an exhaustive treatment of the constitutional issue. Nevertheless, a brief explanation of the constitutional problem follows.

*Strict Scrutiny test*

The right to travel from one state to another is a fundamental interest—a right of United States citizenship held by the poor as well as the rest of the

---

[28]*Bank of America v. Superior Court, supra*, 255 Cal.App.2d 575.
[29]*Conover v. Hall, supra*, 11 Cal.3d 842.

citizenry.[30] Any significant burden a state places on that right is subject to strict scrutiny under the equal protection clause.[31] While it is constitutional to impose a special security requirement on out-of-state citizens who seek to sue in California courts, if they can afford to post that security, federal cases suggest it would be unconstitutional for California courts to enforce this requirement on indigent out-of-state plaintiffs too poor to pay the toll.[32]

---

[30]"The word 'travel' is not found in the text of the Constitution. Yet the 'constitutional *right to travel* from one State to another' is firmly embedded in our jurisprudence. [(]*United States v. Guest* (1966) 383 U.S. 745, 757 [86 S.Ct. 1170, 1177-1178, 16 L. Ed. 2d 239], italics added.] Indeed, as Justice Stewart reminded us in *Shapiro* v. *Thompson,* 394 U.S. 618 [89 S.Ct. 1322, 22 L. Ed. 2d 600] (1969), the right is so important that it is 'assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all.' *Id.,* at p. 643 [89 S.Ct. at p. 1336] (concurring opinion)." (*Saenz v. Roe* (1999) 526 U.S. 489, 498 [119 S.Ct. 1518, 1524, 143 L.Ed.2d 689]; see also *Shapiro v. Thompson, supra,* 394 U.S. 618.)

[31]Significantly, many of these cases involve the right to travel of poor people and financial burdens states have attempted to impose on indigents traveling to their jurisdictions. See, e.g., *Shapiro v. Thompson, supra,* 394 U.S. 618 (one-year residency requirement for welfare benefits unconstitutionally discriminates against welfare recipients who move from one state to another, by burdening their right to travel); *Memorial Hospital v. Maricopa County* (1974) 415 U.S. 250 [94 S.Ct. 1076, 39 L.Ed.2d 306] (one-year residency requirement for free nonemergency hospitalization at county facility likewise denies equal protection); *Saenz v. Roe, supra,* 526 U.S. 489 (state law limiting newly arrived welfare recipients to the level of welfare they received in their prior state of residence is unconstitutional denial of privileges and immunities because it impairs the right to travel enjoyed by these United States citizens).

[32]Several federal cases have upheld the constitutionality of cost bonds imposed on out-of-state litigants against a facial challenge those provisions violate equal protection. However, those courts which analyze the issue in some depth suggest a cost bond would be unconstitutional if applied to deny access to poor people from other states. See, e.g., *Hawes v. Club Ecuestre El Comandate* (1st Cir. 1976) 535 F.2d 140, 142, 144 (in rejecting facial challenge to a new local rule requiring security bonds from nondomiciliary plaintiffs, emphasized the rule itself provided it "shall be liberally interpreted in favor of the plaintiff so as not to preclude his right to sue through excessive bond requirement. Consistent with this, the Court, for good cause shown, may dispense with this requirement," and "[a]ppellants . . . have made no attempt to show that they are financially unable to post the amounts required by the district court. Thus we are unable to say that the security requirements were not designed to further the effective administration of these actions, or that they unduly prejudiced plaintiffs in the pursuit of their claims"); *Aggarwal v. Ponce School of Medicine* (1st Cir. 1984) 745 F.2d 723 (abuse of discretion for a district court to decide against forgiving the bond requirement without weighing the impact on the out-of-state litigant's ability to access the courts); and *Kreitzer v. Puerto Rico Cars* (D.P.R. 1975) 417 F.Supp. 498 (even $500 bond may be excessive where it could preclude out-of-state plaintiff from suing and thus on remand plaintiff must be given opportunity to show it is excessive in relation to his means). See also *Cleveland v. Wilken* (S.D.Fla. 1996) 917 F.Supp. 794 (questions constitutionality of a security for costs requirement if imposed on an indigent out-of-state litigant, before abstaining to allow state courts to have first opportunity to consider the constitutionality of the security provision as a matter of state constitutional law).

The California Legislature has created this security requirement to save in-state litigants the trouble and expense of having to collect their award of fees and costs in another state, should they win. Applying a strict scrutiny standard, this requirement only imposes a minor burden on out-of-state litigants who possess substantial resources and thus does not unconstitutionally impair their right to travel.[33] But if the out-of-state litigant is too poor to post the required security the constitutional calculus changes dramatically. The burden on the right to travel for poor people could scarcely be more pronounced. In essence, California would be precluding poor people who are injured while traveling in our state from suing in this state's courts by exacting a special toll they are unable to afford. This, I submit, would be unconstitutional under the equal protection clauses of the United States and California constitutions—as applied to an out-of-state resident who was poor enough to qualify for in forma pauperis rights in California courts.[34]

### Rational basis test

A requirement indigent out-of-state plaintiffs post security before granting them access to our courts would have difficulty passing muster even under the rational basis standard applicable to equal protection challenges which do not involve a fundamental interest or suspect class.[35]

The legislative rationale supporting pretrial security requirements for out-of-state plaintiffs simply does not hold up when applied to indigent plaintiffs. As explained in a case involving the constitutionality of a district court rule in Puerto Rico similar to Code of Civil Procedure section 1030, "The validity of the rule hinges upon whether there is a rational basis for the distinction between domiciliaries and nondomiciliaries. The apparent purpose behind Rule 5, which *is based on the reasonable assumption that*

---

[33]See cases cited in footnote 32, *ante.*

[34]As applied to out-of-state plaintiffs who possess economic resources sufficient to post security for costs, this issue appears to be settled by the cases cited in footnote 32, *ante.* Those same cases, however, also support the proposition the constitution requires courts to scale the amount of the required security to the out-of-state plaintiffs' ability to pay. Thus, not only must the courts exempt poor people entirely, but they may have to reduce the security bond required for middle income litigants, as well. If the bond is set high enough to fully protect the in-state defendant, it may be higher than middle income out-of-state plaintiffs can afford —and thus deprive them of their day in court. This, most courts have concluded, is an unconstitutional construction of these statutes and requires the judge to lower the security required to a manageable level. (See, e.g., *Hawes v. Club Ecuestre El Comandate, supra,* 535 F.2d 140, *Aggarwal v. Ponce School of Medicine, supra,* 745 F.2d 723, and *Kreitzer v. Puerto Rico Cars, supra,* 417 F.Supp. 498.)

[35]For an example of a California law found unconstitutional under the rational basis standard, see *Del Monte v. Wilson* (1992) 1 Cal.4th 1009 [4 Cal.Rptr.2d 826, 824 P.2d 632] certiorari denied (1992) 506 U.S. 984 [113 S.Ct. 490, 121 L.Ed.2d 429] (no rational basis for Cal Vet provisions denying benefits to military veterans who resided outside California at the time they entered the service).

*domiciliaries are more likely than nondomiciliaries to own assets within the district,* is to enforce an award of costs against a nondomiciliary who may be in the continental United States at the time of judgment. This seems a perfectly reasonable provision. . . . Thus we conclude that the classification is not per se invalid."[36]

Accordingly, the constitutionality of the classification requiring out-of-state plaintiffs but not in-state plaintiffs to post security for costs depends on the "reasonable assumption that domiciliaries are more likely than nondomiciliaries to own assets within" California. But this assumption is not realistic or reasonable when comparing the two classifications of indigent plaintiffs—California and non-California domiciliaries. Neither is likely to own assets in California, or elsewhere. Nor does the greater inconvenience involved in having to sue for costs in another jurisdiction supply a rational basis for requiring the posting of pretrial security by out-of-state plaintiffs who are indigent. Once again it is neither realistic nor reasonable to assume the defendant, if successful, would have any more reason to pursue an out-of-state indigent for costs in that plaintiff's home state than it would to pursue an in-state indigent in California. There would be no hope for a recovery from either class of litigant in either state.

For these reasons, Code of Civil Procedure section 1030 and like provisions—if applied to indigent out-of-state plaintiffs—would unconstitutionally discriminate against those plaintiffs. The fact both of these classifications—the in-state and out-of-state indigent plaintiffs—are indigent ensures they would not be in a position to reimburse California defendants for their litigation costs in any event. Recall again what the Fifth District said 30 years ago, "A local plaintiff who is indigent differs not at all from a nonresident plaintiff who cannot pay costs. In either instance the likelihood of a prevailing defendant collecting his costs is nil, because the plaintiff in each circumstance is a pauper."[37] So, realistically, California defendants do not incur any *increased* risk they will be denied their costs if no pretrial security is required. As a result, such a security requirement can have only one function—whether imposed on in-state or out-of-state indigent plaintiffs—to demand a payment they cannot afford and thus prevent those plaintiffs from pursuing their lawsuits at all; in effect, to deny them access to California's courts. Accordingly, it would be irrational and thus an unconstitutional denial of equal protection to require pretrial security

---

[36]*Hawes v. Club Ecuestre El Comandate, supra,* 535 F.2d 140, 145, italics added.

[37]*Bank of America v. Superior Court, supra,* 255 Cal.App.2d at page 578, and quoted earlier at page 1442, *ante.*

from out-of-state indigent plaintiffs and not from those who reside in California.[38]

As pointed out earlier, however, appellant need not rely on his federal or state constitutional rights. California in forma pauperis rights offer protection enough to him and other out-of-state litigants who find themselves in similar economic straits.[39] It would be hard to imagine a greater "reproach to the system of jurisprudence of the state of California if it could be truly declared that in this [21st] century" this state's "courts . . . shut their doors upon poor suitors,"[40] just because they were from another state. Fortunately, because of *Martin v Superior Court* and its progeny, we do not shut those doors and thus remain free of the reproach. Yet for poor people from outside California it may be some comfort these common law in forma pauperis rights appear to have a constitutional backbone.

---

[38]It is not essential to my conclusion that this discrimination is unconstitutional, but the position would be even stronger if, as appears likely, there is *no legal right* under California law for a winning defendant to recover its costs against an unsuccessful but indigent plaintiff.

Returning, as we must, to the English common law we find a law enacted during the reign of Henry VII's son, Henry VIII. At that time, Parliament passed a statute excusing *indigent* losing plaintiffs from the obligation imposed on other losing litigants to pay the costs of winning defendants. (Stats. 23 Hen. VIII. ch. 15). This law is described in Wood, Institute of the Law of England: or the Laws of England in their Natural Order, according to Common Use (1763) at page 628: "By 23 H. 8 ch. 15, He that sues in Forma Pauperis [See 11 H.7 ch.12] shall not pay costs, but shall suffer such punishment as the justices or judges of the court shall think fit." (Italics omitted.) Under the rationale of *Martin v. Superior Court, supra*, 178 Cal. 289, this provision of the common law is now part of California law and indigent plaintiffs who lose are not liable to pay the costs of the winning defendants after trial just as they are not required to post a security bond beforehand.

If indigent plaintiffs who lose are not legally liable for their opponents' costs under California law the constitutional implications are obvious. Neither the in-state nor out-of-state indigent plaintiffs are legally liable to reimburse California defendants for the latter's litigation costs. So those defendants are not legally entitled to recover those costs, in any event. As a result, a requirement that out-of-state, but not in-state, plaintiffs post a security bond or deposit is not offering protection to a legal entitlement. It only erects a financial barrier those out-of-court plaintiffs cannot leap, thereby denying them access to California's courts in circumstances where in-state plaintiffs would enjoy such access. This renders the denial of equal protection even more obvious and constitutionally indefensible.

[39]*Bank of America v. Superior Court, supra*, 255 Cal.App.2d 575.

[40]*Martin v. Superior Court, supra*, 176 Cal. at page 294.